Filed 5/31/19

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.M., a Minor, on Habeas Corpus. | |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>J.M.,<br><br>        Defendant and Appellant. | A153296; A156093<br><br>(Sonoma County<br>Super. Ct. No. J38898) |

J.M., a minor, entered into a plea agreement, pursuant to which she admitted a felony charge of torture (Pen. Code, § 206). The juvenile court declared J.M. a ward of the court pursuant to Welfare and Institutions Code section 602[1] and committed her to the Department of Corrections and Rehabilitation, Division of Juvenile Justice (also Division of Juvenile Facilities; hereafter DJJ)[2] for a maximum term of seven years, with credit for 206 days in custody. On appeal, J.M. contends the juvenile court did not make certain

---

[*]     Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of the Factual Background, Procedural Background, and parts A, B, C, D, E, F, and H of the Discussion.

[1]     Undesignated statutory references are to the Welfare and Institutions Code. Under section 602, "any minor who is between 12 years of age and 17 years of age, inclusive, when he or she violates any law of this state . . . is within the jurisdiction of the juvenile court, which may adjudge the minor to be a ward of the court." (§ 602, subd. (a).)

[2]     The Department of Juvenile Facilities (DJF) is part of the DJJ, which in turn is part of the Department of Corrections and Rehabilitation. (*In re D.J.* (2010) 185 Cal.App.4th 278, 280, fn. 1.) The parties refer to the authority to which J.M. was committed as either the DJF or DJJ. For consistency, we will refer to it as the DJJ.

legally required findings and abused its discretion. J.M. also contends her admission was not voluntary and her counsel rendered ineffective assistance. Moreover, in supplemental briefing, J.M. argues the case should be remanded so that the juvenile court can determine whether to grant her a mental health diversion under Penal Code sections 1001.35 and 1001.36. In a consolidated petition for writ of habeas corpus, J.M. reiterates her claims of ineffective assistance of counsel and involuntary admission.

In the published portion of our opinion, we conclude the mental health diversion law does not apply to juveniles in delinquency proceedings. In the unpublished portion of our opinion, we order that the juvenile court's imposition of a registration fee for the appointment of counsel and the discretionary probation conditions be stricken from the December 4, 2017, disposition order. We also order that the prohibition against J.M. possessing a "weapon" until age 30 be amended to substitute "firearm" for "weapon," consistent with Penal Code section 29820, subdivision (b). The juvenile court is directed to amend its records in a manner consistent with this opinion and to forward copies of all such pertinent documents to the Director of DJJ (see *post*, part E). We also direct the trial court clerk to correct the date on the notice of appeal (see *post*, p. 8, fn. 3). In all other respects, we affirm the disposition order, without prejudice to J.M. raising the issue of additional post-disposition credits in the juvenile court (see *post*, part D, pp. 20–21), and we deny the petition for a writ of habeas corpus.

### FACTUAL BACKGROUND

The facts of J.M.'s offense are taken from the probation report and the video evidence of the attack. On May 13, 2017, J.M. (aged 14) and another female minor, S.S., attacked minor Jane Doe at a cemetery. S.S. and J.M. took turns slapping, punching and kicking Jane and pulling her hair. Jane estimated that the attack lasted 10 minutes, and that she was punched 100 times and kicked 50 times. During the attack, Jane lost a large amount of blood and also lost control of her bladder and bowel functions. Her injuries included a fractured skull and broken nose.

S.S. and J.M. recorded cell phone videos of the attack and shared them with friends. Videos obtained by law enforcement depicted J.M. and S.S. repeatedly accusing

2

Jane of "talking shit" as Jane apologized and pleaded with them. In the longer of the two videos, J.M. was seen urging Jane to fight, punching and slapping her, and pulling her hair. Jane had blood on her face, and her speech was slurred. At times she appeared about to faint, prompting J.M. to say, " 'Oh, don't act like you're gonna faint.' " After Jane lost control of her bladder, J.M. exclaimed, "She peed her pants, bro!" as S.S. continued to punch Jane in the head. Moments later, S.S. kicked, punched, and shoved Jane, causing her to fall onto a nearby dirt berm. As she fell, her head "snap[ped] violently back to front," and J.M. exclaimed, "Oh shit, [S.S.]!" and laughed as S.S. continued to punch Jane.

At one point, Jane was seated on the ground with S.S. standing behind and leaning over her. Jane put her right hand to her face, and J.M. asked "Are you okay?" Jane responded, "No," and J.M. said, "No, you're not okay," as S.S. continued punching Jane on the right side of her head. J.M. continued to demand that Jane fight her and hit Jane's face and head. During the attack, Jane lost control of her bowel functions, and S.S. exclaimed, "This bitch shit her pants, she shit her pants, ha!" J.M. then noticed blood on her shoe and ordered Jane to lick it off. Jane complied. S.S. then ordered Jane to lick the blood off the bottom of her shoe, and Jane did so. J.M. and S.S. both stated, "Good girl." The video ended with Jane fleeing the scene, as J.M. said "Bye!"

In an interview with a sheriff's deputy after the attack, J.M. said that she had shared a secret with Jane and trusted her not to tell anyone, but Jane revealed the secret to others at school. J.M. claimed that she did not want to fight Jane and only wanted to talk to her, and that S.S. had arranged the meeting at the cemetery. After the deputy showed J.M. the videos of the attack, J.M. cried, saying " 'It's cruel, what we did,' " and stated she wanted to take responsibility for what happened.

A detective interviewed Trevor, who was J.M.'s boyfriend and Jane's ex-boyfriend. Trevor told the detective he believed Jane was spreading rumors about J.M. and was trying to cause problems between him and J.M. J.M. sent a video of the attack to Trevor and two others. He provided deputies with his cell phone, which contained a text

message from J.M. to Jane three days prior to the attack in which J.M. physically threatened Jane for "talking shit."

J.M. denied that she and S.S. planned the attack together. She told an investigator that she and S.S went dog-walking together and ended up at the cemetery, when S.S. told J.M. " 'to count to five, then walk up.' " A few minutes later, J.M. arrived at a bench and saw S.S. and Jane there. S.S. suddenly yelled at J.M., " 'I'm going to fight you, bitch,' " which confused J.M. J.M. also noticed Jane recording them on video and thought it was a set-up, but S.S. then told J.M., " 'Don't worry, we're going to get her. Ready?' " S.S. then started attacking Jane. J.M. told investigators she did not understand what was going on until S.S. started attacking the victim. J.M. also claimed to remember only certain parts of the attack, but confirmed she was not under the influence of drugs or alcohol during the offense.

According to the probation report, J.M. disclosed that she suffered from depression and posttraumatic stress disorder (PTSD) due to a history of abuse and trauma. J.M. was physically abused by her father and repeatedly raped by her mother's boyfriend. J.M. has suffered from mood and behavioral disorders, and has engaged in self-cutting and attempted suicide multiple times.

J.M. met and befriended S.S. while attending New Directions School, a therapeutic non-public school. J.M. described S.S. as " 'bolder' " and " 'more out there' " than she was. J.M. later transferred to Casa Grande High School (Casa Grande), which she found to be overwhelming due to its size and lack of structure, but she maintained good grades, participated in sports and cheerleading, and was enrolled in junior college.

J.M. met Jane at Casa Grande. After learning that Jane's mother sometimes hit Jane, J.M. confided that she had been physically and sexually abused by her former "stepfather." A few days later, J.M. learned that Jane had been telling people at school that J.M. had sex with her father. When J.M. approached Jane and asked to talk with her, Jane replied, "I don't want to talk to you, psycho bitch, go fuck your dad." Jane also began spreading rumors about J.M. "giving oral sex to kids at school." J.M.'s mother and

4

sister advised her to ignore Jane, and J.M. "was 'already kind of over it,' " but S.S. encouraged J.M. to fight Jane.

J.M. told investigators that she did not want to participate in the attack on Jane, but felt she had to. She said she had only vague memories of what occurred after S.S. first grabbed Jane, and during the attack, J.M. "thought of [her stepfather] and her biological father, who were both violent toward her, and she 'pictured [her stepfather] there.' "

### PROCEDURAL BACKGROUND

In May 2017, the People filed a juvenile wardship petition (§ 602) alleging J.M. committed two felony offenses against Jane: torture (Pen. Code, § 206; count 1), and assault by means of force (Pen. Code, § 245, subd. (a)(4); count 2), with an enhancement on count 2 for personal infliction of great bodily injury (Pen. Code, § 12022.7, subd. (a)). The juvenile court appointed public defender Cristina Hess to represent J.M. and assessed a $50 registration fee.

On September 11, 2017, Hess informed the juvenile court that J.M. was prepared to admit the torture allegation and to request dismissal of the balance of the petition. J.M. and her counsel signed a form entitled "Waiver of Constitutional Rights and Declaration in Support of Minor's Motion to Admit/Plead No Contest" (the "waiver form"), and the juvenile court questioned J.M. extensively on her understanding of the rights she was waiving. Hess stipulated on the record that a factual basis for the admission existed based upon her own investigation, and that she consented to J.M.'s admission. In the waiver form, Hess represented that J.M.'s decision to admit "was made only after a full discussion with me of the facts and the law of this case." Following the plea colloquy, the court found that J.M. was waiving her rights to a hearing on the torture allegation and her constitutional rights "freely, voluntarily, knowingly, and intelligently." The court also determined that J.M. "understands the nature of her conduct alleged in the petition and the consequences of an admission, and that there's a factual basis for the admission."

The juvenile court then informed J.M. that torture carries "under adult law, a life sentence. So that means you could remain in the [DJJ] up until age 25, and then there would be a period of parole after you turned 25." The court also recited the petition's

5

allegations against J.M. as follows: "[O]n or about May 13, 2017, here, in the County of Sonoma, you did unlawfully and with the intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for a sadistic purpose, inflict great bodily injury on Jane Doe, as defined in [section] 12022.7 of the Penal Code." At this point, J.M. admitted the charge of torture. The court accepted the admission and ordered a psychological evaluation. The court indicated that two doctors previously used were unavailable, and the court had "call[ed] an additional doctor," but the matter was continued for a day to find an available doctor. The next day, the court appointed Kevin Kelly, Ph.D., to perform the evaluation.

In his report, Dr. Kelly indicated the focus of the evaluation was J.M.'s "psychological status in light of the possibility of long-term placement or commitment to DJJ." He diagnosed her with PTSD stemming from multiple childhood experiences, and symptoms of anxiety and depression. He noted that J.M. scored moderately high levels on the submissive scale in his testing, and she characterized herself as a follower. Dr. Kelly opined that while the prognosis for treatment within the community was favorable, it was "[u]nknown and undeterminable . . . whether [J.M.] was at risk for acting out in a violent manner while treatment was in progress." She " 'was not out of the woods yet in regard to her volatility,' " and it would take several years of maturing and therapy for her to overcome over responsiveness to triggers. Dr. Kelly concluded that treatment of J.M.'s depressive symptoms through programs of the DJJ "would provide maximal safety for the community while affording [J.M.] opportunity to complete her education with less risk of conflict among her peers." While DJJ placement would have the drawback of putting J.M. in proximity with more criminally sophisticated juveniles, Dr. Kelly felt J.M. "had the adaptive skills and psychological defenses that would serve her well, whether in treatment in the community or through [DJJ]."

Probation officer Victoria Nash issued a report recommending that J.M. be committed to DJJ. Nash indicated that a probation screening committee had reviewed all dispositional options and ruled out community-based treatment as too much of a risk to the public given the severity of the offense. California did not have locked treatment

6

facilities that were appropriate to J.M.'s needs to address public safety, and the only viable options were out-of-state secured placement. The screening committee noted DJJ has a small female population at its Ventura facility and uses an "Integrated Behavior Treatment Model"—"an evidence-based practice that includes trauma-focused cognitive behavior therapy." The facility also has a separate mental health unit to serve those with more intensive therapy and supervision, and parents can take an active role in treatment and case planning.

At the disposition hearing on November 13, 2017, the juvenile court, on Hess's request, continued the matter so that the probation department could conduct a more thorough evaluation regarding additional placement options. The court also indicated its intent to review the videos. Thereafter, the probation department submitted a supplemental report, which discussed various placement options but concluded they were not of sufficient duration to provide for public safety or J.M.'s rehabilitation.

At the continued hearing on December 4, 2017, the juvenile court declared J.M. a ward of the court. The court found J.M. came "within the provisions of section 602 and 777 of the Juvenile Court Law and is eligible for the [DJJ]." The court ordered J.M. to have no contact with S.S. or the victim and her family, to stay away from the victim's property, to not annoy, harass, harm or threaten the victim, and to pay a restitution fine and direct restitution to the victim. The court further ordered that J.M. could not possess a "weapon" until age 30.

The juvenile court stated it took into consideration J.M.'s best interests, including her mental health issues, but concluded treatment at the local level or in placement was not in her best interests due to the callousness and cruelty of the offense and the need to protect public safety. The court further stated, "This offense of torture was a hate crime within the meaning of [section 707, subdivision (b)]." The court said it considered the individual facts and circumstances of the case in determining the maximum period of confinement pursuant to section 731, subdivision (c), and found it "probable that [J.M.] will benefit from the reformatory discipline or other treatment as provided by the [DJJ]." The court also observed that J.M. "is an individual with exceptional needs" and has an

7

Individualized Education Program (IEP) "that will be included in the packet sent to the [DJJ]." J.M. was committed to the Ventura Youth Correctional Facility in Camarillo, California, for a maximum period of seven years, with credit for 206 days in custody. She remained in custody in juvenile hall until February 28, 2018, when she was transported to the Ventura facility.

J.M. filed a notice of appeal.[3] She also filed a petition for a writ of habeas corpus. We consolidated the habeas petition with the appeal and directed the People to furnish an informal response to the petition.

## DISCUSSION

### A. Minor Understands the Nature of the Offense

J.M. contends the juvenile court failed to make the requisite finding that she understood the nature of the offense she was admitting. Before accepting a minor's admission in a case under section 602, the juvenile court must, among other things, "find and state on the record that it is satisfied that the child understands the nature of the allegations and direct consequences of the admission." (Cal. Rules of Court, rule 5.778(c).) "It is a principal purpose of the juvenile court rules that the court ascertain and assure itself that the minor understands the nature of the charges." (*In re Regina N.* (1981) 117 Cal.App.3d 577, 585 (*Regina N.*).)

*Regina N.* is instructive but, contrary to J.M.'s assertions, does not support her claim of error. In *Regina N.*, the minor had signed a voluntary admission form that "referred cryptically to 'the contents of the Petition,' and required only that 'I affirm that my misconduct is voluntarily admitted by me.' " (*Regina N.*, *supra*, 117 Cal.App.3d at pp. 586–587.) The juvenile court made no attempt to determine whether the minor understood the offense she was admitting, and made no finding confirming the minor's understanding. (*Id.* at pp. 584–586.) This was particularly problematic because the

---

[3] Although the notice of appeal was filed-stamped January 4, *2017*, both parties agree this was a clerical error. We deem the notice of appeal to have been timely filed in January 2018 and direct the trial court clerk to correct the date on the notice of appeal. (*People v. Mitchell* (2001) 26 Cal.4th 181, 186–187.)

8

minor's comments at the disposition hearing appeared to indicate her misapprehension of the admitted offense. Specifically, the minor continued to make a factual assertion "which, if true, would have absolved her of the offense claimed to be admitted." (*Id*. at p. 587.)

Likening her case to *Regina N.*, J.M. argues the waiver form used here was inadequate because it did not mention the elements of torture. In response, the People observe that before eliciting J.M.'s admission, the juvenile court did in fact recite the torture count allegations, which closely tracked the statutory definition of the offense. We need not decide whether a juvenile court's pre-plea recitation of the statutory definition of an offense is sufficient, by itself, to uphold a finding that the juvenile understood the nature of that offense. Significantly, the totality of the circumstances leading up to J.M.'s admission supported the juvenile court's finding that J.M. understood the nature of the torture count and the direct consequences of her admission.

At the May 16, 2017, detention hearing, the juvenile court read the allegations of the petition to J.M. for the first time. Just as in the September 11, 2017, plea hearing, the court's reading tracked the statutory definition of torture, identified Jane Doe as the victim, and specified the date of the alleged crimes. J.M.'s counsel informed the court that she expected entry of the plea "to take more time than usual based on the seriousness of the offense." The juvenile court, commenting on the seriousness and troubling nature of the offense, continued the plea hearing, issued a criminal protective order, and ordered that J.M. be detained. At a plea hearing on May 31, 2017, the court granted the request of J.M.'s counsel for a continuance due to counsel's report of significant outstanding discovery in the matter. At the June 21, 2017, hearing, J.M.'s counsel informed the court she had just received the People's offer on the torture count. J.M.'s counsel requested more time "to be able to make a decision regarding the matter and the [People's] offer," and the court responded, "I understand that, because Count 1 is a very serious offense. So certainly if the offer was made today by the District Attorney you would want some time to speak to [J.M.] about that and explain the ramifications of her admitting the charge, which is extremely serious."

9

In light of the discussions at these various hearings, the juvenile court could reasonably conclude at the plea hearing on September 11, 2017, that J.M.'s counsel undertook a review of all available discovery and, consistent with her prior representations in court and her initialed statement on the waiver form, counsel did in fact fully discuss the facts and the law with J.M. and explain the nature and seriousness of the torture charge and ramifications of an admission. And when J.M. admitted the torture charge after hearing a reading of the torture allegations, the court could reasonably find that J.M. did so with a sufficient understanding of the nature of that charge and the consequences of her admission. Moreover, in contrast to the facts in *Regina N.*, there is nothing in the instant record casting doubt on the juvenile court's finding, i.e., J.M. never took a position or made any comments indicating a misunderstanding of the crime she was admitting.

J.M. nonetheless maintains the juvenile court's handling of her admission was inadequate. Relying on *People v. Wiley* (1976) 18 Cal.3d 162 (*Wiley*) and the Department of Justice's manual for Proposition 115,[4] J.M. argues the court's reading of the statute-tracking torture allegations failed to convey that the requisite intent for torture is a calculated and "cold-blooded" state of mind, which is not satisfied when a juvenile merely engages in a spontaneous fight.

J.M.'s reliance on these authorities is misplaced. *Wiley*'s discussion of "cold-blooded" intent, and the references to *Wiley* in the Proposition 115 manual, are meant to focus the attention on the perpetrator's intentional state of mind and away from the extent of the victim's suffering—to "dispense with the requirement of proof the victim suffered pain." (*Raven*, *supra*, 52 Cal.3d at p. 345.) These authorities do not suggest the terms "calculated" and "cold-blooded" describe a requisite state of mind akin to premeditation, or one that is not conveyed in the plain statutory language "intent to cause cruel or

---

[4] Proposition 115, the "Crime Victims Justice Reform Act" enacted by voters in 1990, added Penal Code sections 206 and 206.1 "to define the crime of torture, dispense with the requirement of proof the victim suffered pain, and impose a term of life imprisonment." (*Raven v. Deukmejian* (1990) 52 Cal.3d 336, 345 (*Raven*).)

10

extreme pain and suffering." (Pen. Code, § 206.)  Thus, the juvenile court's reading of the statute-tracking torture allegations was not insufficient for failing to require premeditation and deliberation.  (See *People v. Massie* (2006) 142 Cal.App.4th 365, 371–372 (*Massie*) [intent to inflict pain and injury "can be formed without any reflection at all"]; *People v. Pre* (2004) 117 Cal.App.4th 413, 420 (*Pre*).)  Moreover, the remaining statutory terms "revenge, extortion, and persuasion are self-explanatory" and "[s]adistic purpose encompasses the common meaning, ' "the infliction of pain on another person for the purpose of experiencing pleasure." ' " (*Massie*, *supra*, at p. 371.)

In sum, we conclude the juvenile court's recitation of the torture allegations, considered together with the circumstances leading up to and surrounding J.M.'s admission, amply support the juvenile court's finding that J.M. understood the nature of the torture charge and the direct consequences of her admission.  (Cal. Rules of Court, rule 5.778(c); *Regina N.*, *supra*, 117 Cal.App.3d at p. 585.)

## B. Factual Basis for the Admission

J.M. argues there was an insufficient factual basis for her admission because: (1) she lacked the requisite "cold-blooded" state of mind for torture; (2) her personal characteristics and history (i.e., submissiveness, history of abuse, PTSD, depression and anxiety) preclude a finding of the requisite intent to torture; (3) the offense was intended to apply to hardened criminals for heinous acts, not 14-year-old children; and (4) the admission was not in J.M.'s best interests.[5]

---

[5]    The People assert that, by her admission, J.M. forfeited many of the challenges she presents on appeal, including the sufficiency of the plea's factual basis and the voluntariness of her plea.  J.M. argues her appeal is cognizable under *People v. Palmer* (2013) 58 Cal.4th 110 (*Palmer*).  In *Palmer*, the California Supreme Court declined to resolve a dispute among two appellate courts as to whether a challenge to a plea's factual basis is cognizable on appeal, finding both cases distinguishable and concluding the challenge before it was cognizable on appeal notwithstanding defense counsel's stipulation to a factual basis.  (*Palmer*, *supra*, at pp. 115–116.)  We likewise need not weigh in on the split of authorities because, for the reasons discussed below, even if appellate review of J.M.'s factual basis claim is cognizable and error is assumed, any such error was harmless.  As for J.M.'s other challenges, we find she is permitted to appeal her admission to criminal conduct on the grounds that it was not voluntary and

11

The juvenile court is required to expressly find a factual basis for a juvenile's admission or plea of no contest. (Cal. Rules of Court, rule 5.778(f)(6).) The requirement of stating a factual basis for the record serves " 'to protect against the situation where the defendant, although [s]he realizes what [s]he has done, is not sufficiently skilled in law to recognize that [her] acts do not constitute the offense with which [s]he is charged.' " (*People v. French* (2008) 43 Cal.4th 36, 50.) The court is permitted to accept a stipulation from counsel that a factual basis for the plea exists, so long as "the plea colloquy reveals that the defendant has discussed the elements of the crime and any defenses with his or her counsel and is satisfied with counsel's advice." (*Palmer*, *supra*, 58 Cal.4th at p. 118.) The court has "wide discretion" in determining whether a sufficient factual basis exists, and the exercise of this discretion will be reversed only for abuse. (*Id*. at pp. 118–119.)

Here, the juvenile court accepted Hess's stipulation to a factual basis, but there was nothing in the waiver form or in the colloquy at the September 11, 2017, plea hearing indicating that Hess had specifically discussed the elements of the crime or any defenses with J.M. Consequently, compliance with *Palmer* and rule 5.778(f)(6) was lacking. (*Palmer*, *supra*, 58 Cal.4th at p. 118.)

Nonetheless, where, as here, counsel below stipulates to a factual basis for a plea, but appellate counsel disputes its adequacy, we may review the record to determine if it establishes an adequate factual basis for the plea. (*People v. Mickens* (1995) 38 Cal.App.4th 1557, 1564 (*Mickens*).) In conducting this review, "we are not looking for evidence sufficient to support a conviction in a trial after a not guilty plea. Instead, we are seeking to determine whether the [record] contain[s] sufficient information upon which the trial court could conclude there was a prima facie factual basis for the charges." (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1579–1580.) In *Mickens*, *supra*, at page 1565, the appellate court found the trial court's non-compliance with Penal

---

that it involves the legal impossibility that minors are legally incapable of forming the intent for torture. (*In re M.V.* (2014) 225 Cal.App.4th 1495, 1519.)

Code section 1192.5[6] was harmless based on information contained in the probation officer's report alone.  (Cf. *People v. Tigner* (1982) 133 Cal.App.3d 430, 435 [non-compliance found prejudicial where appellate court had available for review only a presentence report in which the defendant denied any culpability].)

Here, we detailed the contents of J.M.'s probation report above (*ante*, pp. 2–5) and conclude they support a factual basis finding.  Hence, any error in omitting to place these facts on the record of the plea hearing was harmless.  (*Mickens*, *supra*, 38 Cal.App.4th at pp. 1563–1565.)

Regardless of her counsel's stipulation and the facts recounted in the probation report, J.M. cites *People v. Tubby* (1949) 34 Cal.2d 72 (*Tubby*) for the position that her attack on Jane did not constitute torture because she lacked the requisite cold-blooded intent.[7]  As indicated, however, the relevant inquiry is whether the juvenile court could find a prima facie factual basis for the torture charge.  (*Wilkerson*, *supra*, 6 Cal.App.4th at p. 1580.)  We conclude it could.  And unlike the defendant in *Tubby*, J.M. was not intoxicated during the attack, and the record here was not devoid of any explanation as to why she would desire the victim to suffer.  (*Tubby*, *supra*, at pp. 76–77.)  On the contrary, substantial evidence—including the text message threat to Jane, the comments and conduct of J.M. captured in the videos, and the statements of J.M. and Trevor to investigators—supported the inference that J.M. intended to punish and retaliate against Jane for betraying her trust and/or speaking ill of her.[8]

---

[6]    This statute contains the factual basis requirement for pleas of guilty or nolo contendere by adult offenders.

[7]    "[T]orture has two elements:  (1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."  (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223.)  This specific intent "can be established by the circumstances of the offense and other circumstantial evidence."  (*Pre*, *supra*, 117 Cal.App.4th at p. 420.)

[8]    J.M. highlights how she asked Jane, "Are you okay?"  But it is disingenuous to suggest this was out of real concern, as J.M. followed by saying, "No, you're not okay,"

Moreover, that J.M. intended to cause cruel and extreme pain and suffering is supported by the undisputed evidence of the vast number of times Jane was punched and kicked and the severity of Jane's injuries, which included a transitory loss of bladder and bowel control, a large amount of blood loss, a fractured skull, and a broken nose. (See *Pre*, *supra*, 117 Cal.App.4th at p. 421 [condition of victim's body may establish circumstantial evidence of intent].) That J.M. acted with a sadistic purpose is reasonably inferred from her laughter and repeated efforts to humiliate Jane, which included forcing Jane to lick blood off her shoe.

Relying upon Eighth Amendment cases relating to the sentencing of juvenile offenders, J.M. also argues there is an implied presumption in the law that adolescents, by virtue of their developmental immaturity, are incapable of forming the requisite intent of torture. (E.g., *Roper v. Simmons* (2005) 543 U.S. 551 [Eighth Amendment prohibits death penalty for juveniles]; *Graham v. Florida* (2010) 560 U.S. 48, 82 [Eighth Amendment prohibits life sentence without parole for juvenile non-homicide offenders]; *Miller v. Alabama* (2012) 567 U.S. 460, 489 (*Miller*) [Eighth Amendment prohibits life sentence without parole for juvenile homicide offenders].) But these cases and the high court's recognition of the " 'lessened culpability' and greater 'capacity for change' " of juvenile offenders (*Miller*, at p. 465) preclude only the imposition of mandatory sentences that do not allow for the appropriate mitigating considerations. Because these cases say nothing about overturning the minors' *convictions* for serious crimes, they provide no support for the existence of an implied presumption that a juvenile offender cannot *commit* serious crimes like torture.

J.M. argues the Legislature has chosen to treat minors differently in various statutes and bills designed to give juvenile offenders added protections and second chances—i.e., Senate Bill No. 1391 (2017–2018 Reg. Sess.) [amending section 707 to eliminate transfer authority and jurisdiction of adult criminal court over juveniles aged 14 or 15 at time of offense]; and section 625.6 [consultation with legal counsel prior to

and continued attacking and humiliating Jane. This also demonstrated that J.M. was not heedless of Jane's pain and suffering.

custodial interrogation cannot be waived by youth 15 years or younger].) But this merely demonstrates that when the Legislature wants to provide added protections or leniency for juvenile offenders, it does so expressly. The Legislature has not done so for the crime of torture. The juvenile court had clear statutory authority to accept J.M.'s admission to the offense of torture because she was between the ages of 12 and 17 at the time she violated a "law of this state" (§ 602, subd. (a)), and Penal Code section 206 is a law of this state that does not limit its application to adult offenders. Moreover, section 707, subdivision (b)(23), expressly lists torture as an offense that a 14 or 15-year-old can be charged with, even if he or she cannot be transferred to adult criminal court for prosecution.[9]

Finally, J.M. generally argues the crime of torture should apply only to the most heinous acts by hardened criminals like the defendant in *People v. Singleton* (1980) 112 Cal.App.3d 418 (*Singleton*). She recounts the gruesome details of various torture cases and contends her offense did not rise to the same level. (See *People v. Barrera* (1993) 14 Cal.App.4th 1555, 1555 (*Barrera*) [shooting victim in leg and forcing him to walk]; *People v. Hale* (1999) 75 Cal.App.4th 94, 106 [smashing victim's teeth out with hammer]; *People v. Burton* (2006) 143 Cal.App.4th 447, 452 [inflicting four deep cuts to victim's face].)

*Barrera*, however, expressly rejected the argument J.M. makes here. (*Barrera*, *supra*, 14 Cal.App.4th at p. 1573; *Pre*, *supra*, 117 Cal.App.4th at p. 423.) In any event, even though other victims of torture may have suffered more than Jane, the record nonetheless discloses a prima facie factual basis for the torture charge, including facts showing J.M.'s intent to cause Jane severe pain and suffering. Moreover, J.M. provides

---

[9]     In supplemental briefing, J.M. cites Penal Code section 415.5 as additional support for her argument that fights between 14-year-olds do not constitute torture. We find nothing instructive from this statute, which makes it a misdemeanor for any person, other than a registered student, to unlawfully fight or maliciously and willfully disturb the peace of another in school buildings or on school grounds. (Pen. Code, § 415.5, subds. (a), (f).)

no authority supporting a defense to torture based on her PTSD, history of abuse, or personal characteristics.

### C. Voluntariness of the Admission

A juvenile court considering an admission by a juvenile must find "[t]he admission or plea of no contest is freely and voluntarily made." (Cal. Rules of Court, rule 5.778(f)(5).) J.M. argues her admission was not voluntary because: (1) she was not informed by her counsel or the court about the elements of the offense, and (2) she was misadvised by the court about the consequences of her admission.

This first contention is based on a premise we have already rejected—that a juvenile acting out of raw emotion is incapable of having the requisite intent for torture. As for J.M.'s second contention, the People concede, and we agree, that the juvenile court was mistaken in advising J.M. that she could remain in the DJJ until age 25. For minors, such as J.M., who are declared wards and alleged to have committed a section 707, subdivision (b), offense between July 1, 2012 and July 1, 2018, the maximum period they can be held at the DJJ (assuming no order for further detention) is until age 23. (§ 1769, subd. (c).)[10]

Nonetheless, the error was harmless. "[A]n uninformed waiver based on the failure of the court to advise an accused of the consequences of an admission constitutes error which requires that the admission be set aside only if the error is prejudicial to the accused." (*In re Ronald E.* (1977) 19 Cal.3d 315, 321.) To satisfy the prejudice requirement, the defendant must show a reasonable probability that, but for counsel's errors, she would not have pleaded guilty and would have insisted on going to trial. (*Hill v. Lockhart* (1985) 474 U.S. 52, 59 (*Hill*).) J.M. fails to demonstrate a reasonable probability that she would have been *less* inclined to admit count 1 had she been informed the maximum commitment term would be *shorter* than she was told.

---

[10] While the maximum age has been raised to 25 for certain offenses, those changes only apply to commitments made on or after July 1, 2018. (§§ 607, subd. (g), 1769, subd. (d)(3).)

## D. Abuse of Discretion

J.M. argues the juvenile court abused its discretion in committing her to DJJ because: (1) there was no substantial evidence of a probable benefit to her or that less restrictive options were inappropriate; (2) the commitment was not in her best interests because the Ventura facility was far from her family, and it was inappropriate for her educational and mental health needs; (3) the commitment was overly punitive and retributive; (4) the decision was based on an erroneous finding that the offense was a "hate crime"; (5) the court failed to exercise its discretion in giving J.M. the maximum term of confinement; and (6) the court failed to account for all custody credits.

"The juvenile court must find a commitment to DJJ to be a probable benefit to the minor." (*In re Travis J.* (2013) 222 Cal.App.4th 187, 199, citing § 734.) "An appellate court 'must indulge all reasonable inferences to support the decision of the juvenile court and will not disturb its findings when there is substantial evidence to support them. [Citations.]' [Citation.] 'In determining whether there was substantial evidence to support the commitment, we must examine the record presented at the disposition hearing in light of the purposes of the Juvenile Court Law.' " (*In re Jose T.* (2010) 191 Cal.App.4th 1142, 1147.)

The general purpose of the Juvenile Court Law (§ 200 et seq.) "is to provide for the protection and safety of the public and each minor under the jurisdiction of the juvenile court and to preserve and strengthen the minor's family ties whenever possible, removing the minor from the custody of his or her parents only when necessary for his or her welfare or for the safety and protection of the public." (§ 202, subd. (a).) In this regard, " ' "the Legislature has not abandoned the traditional purpose of rehabilitation for juvenile offenders," and "[j]uvenile proceedings continue to be primarily rehabilitative." ' " (*In re Carlos J.* (2018) 22 Cal.App.5th 1, 5 (*Carlos J.*).)

In the instant matter, the factual details and video footage of the offense supported the juvenile court's finding of the egregiousness of the offense, which in turn supported the need to protect public safety. (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 6 [court may consider commitment as means of protecting public].) Although the probation

17

department found J.M.'s risk of reoffending to be low, Dr. Kelly's finding that J.M.'s volatility and risk of acting out violently during treatment were "[u]nknown and undeterminable" nonetheless supported continuing concerns for public safety.

The juvenile court's finding that J.M. would likely benefit from the reformatory discipline and treatment provided by DJJ was also supported by substantial evidence. The probation report discussed the availability of programs at DJJ to address J.M.'s mental health needs, and Dr. Kelly opined that treatment of J.M.'s depressive symptoms through DJJ programs would balance safety for the community with giving J.M. the opportunity to complete her education with less risk of conflict among her peers. Although Dr. Kelly expressed concern about J.M. being in proximity to criminally-sophisticated juveniles, he concluded she had the adaptive skills and psychological defenses to deal with this.

J.M. criticizes the probation report as lacking specific evidence of DJJ's programs that were expected to benefit her. But "the probation department is not required in its report and initial testimony to provide in depth information about the [DJJ's] programs." (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 13.) In *Carlos J.*, the court committed a juvenile with PTSD and gang affiliations to DJJ despite having no information regarding mental health or gang intervention services provided by DJJ. (*Id*. at p. 11.) Our colleagues in Division Five reversed, holding that in order for the juvenile court to make an informed assessment, "there must be *some* specific evidence in the record of the programs at the [DJJ] expected to benefit a minor." (*Id*. at p. 10)

Here, the record was not similarly devoid of such evidence. The probation report identified and briefly described the Ventura facility's use of the "Integrated Behavior Treatment Model" and the availability of a separate mental health unit. And contrary to J.M.'s suggestion otherwise, the report also indicated the probation screening committee reviewed all dispositional options but ruled out less restrictive options such as community-based treatment because they were not of sufficient duration to provide for public safety or J.M.'s rehabilitation, and there were no locked treatment facilities in California.

While a juvenile court must also consider the nearness of a juvenile placement to the juvenile's home in order to achieve the goals of family reunification and rehabilitation, "a minor's special needs and best interests may justify a distant placement." (*In re Nichole H.* (2016) 244 Cal.App.4th 1150, 1156.) Here, substantial evidence supported the juvenile court's decision that it was in J.M.'s best interests to be placed in the Ventura facility, despite its distance from J.M.'s home. The egregiousness of the offense ruled out community-based treatment, but there were no locked treatment facilities appropriate to her needs in California, and the probation department's supplemental report concluded that the Ventura facility was more accessible to J.M.'s family than an out-of-state program.

We also conclude the juvenile court did not, as J.M. claims, fail to consider her educational needs. The probation report included a detailed summary of J.M.'s educational history, and Dr. Kelly opined that J.M. would be able to focus on her education in DJJ. The court received and reviewed additional information on J.M.'s educational history, found that she had "exceptional needs" in this regard, and included her IEP in the packet sent to DJJ. The court could properly assume DJJ, which is responsible for assessing the educational needs of each ward upon commitment (§ 1120, subd. (b)), would fulfill its duty to assess and address J.M.'s educational needs.

J.M. argues the seven-year maximum term of confinement was an abuse of discretion because the juvenile court apparently believed it had no discretion in this regard and adopted an erroneous statement in the probation report that torture would carry a seven-year *minimum* term. On a silent record, it is presumed the court performed its statutory duty under section 731, subdivision (c), to determine, in its discretion, whether to impose either the equivalent of the maximum period of imprisonment that could be imposed upon an adult convicted of the offense committed by the juvenile, or some lesser period based on the facts and circumstances of the matter that brought the juvenile under the court's jurisdiction. (*In re Julian R.* (2009) 47 Cal.4th 487, 498–499 (*Julian R.*).) Here, the juvenile court explicitly stated it had considered the facts and circumstances of J.M.'s case pursuant to section 731, subdivision (c), in setting the

maximum term, and the court never stated that torture carried a seven-year minimum term.  The egregiousness of the offense, as shown by the probation report, the video evidence, and the statements of the victim and her mother, along with J.M.'s need for long-term mental health treatment, provided a sufficient basis for a long-term of commitment at DJJ.

J.M. argues the juvenile court abused its discretion in finding the "offense of torture was a hate crime within the meaning of [section] 707, [subdivision] (b)."  Hate crimes are not among the offenses listed in section 707, subdivision (b), but torture is. (§ 707, subd. (b)(23).)  Indulging all reasonable inferences to support the decision, we conclude the court likely misspoke while attempting to state that torture is an offense listed in section 707, subdivision (b).  Hence, we reject as speculative J.M.'s contention that this misstatement "was an improper and unsupportable finding that appears to have affected its determination."

Finally, J.M. argues the juvenile court abused its discretion by not crediting her for 273 days of dead time and additional credits for her time spent in custody between the December 4, 2017, disposition hearing and the day she was transported to the DJJ's Ventura facility on February 28, 2018.  A minor is entitled to credit against his or her maximum term of confinement for the time spent in custody before the disposition hearing.  (*In re Emilio C.* (2004) 116 Cal.App.4th 1058, 1067.)  But because the record is silent on how the juvenile court considered the relevant circumstances in calculating J.M.'s credits for her time spent in custody before the December 4, 2017, disposition hearing, we presume the court performed its duties and was aware of and followed the applicable law.  (*Julian R.*, *supra*, 47 Cal.4th at pp. 498–499.)  As for credits after the disposition hearing, J.M. is generally correct that a minor is entitled to credits for the days he or she was detained in juvenile hall after the disposition hearing and until his or her placement.  (*In re J.M.* (2009) 170 Cal.App.4th 1253, 1256.)  However, J.M. fails to show error on the part of the juvenile court in failing to calculate those credits, since any such period in custody had not yet occurred at the time the disposition order was made. (*In re Edward B.* (2017) 10 Cal.App.5th 1228, 1238–1239.)  The issue of whether J.M. is

20

entitled to additional credits for her time in custody after the December 4, 2017, disposition hearing is best raised with the juvenile court in the first instance.

### E. Conceded Errors

#### 1. *Public defender fee*

J.M. argues, the People concede, and we agree the juvenile court erred in imposing a $50 public defender fee. Recent amendments to sections 903.1, 903.15 and 903.45 eliminated the $50 registration fee for the appointment of counsel for a juvenile in a wardship proceeding. (Stats. 2017, ch. 678, §§ 20, 21, 25.5 (Sen. Bill No. 190); § 903.1, subd. (a)(1)(B)(i); *In re D.B.* (2018) 24 Cal.App.5th 252, 257–260.) Accordingly, we strike the imposition of the registration fee.[11]

#### 2. *Section 777*

J.M. argues, the People concede, and we agree the juvenile court erred in stating orally at the disposition hearing that J.M. came within the provisions of section 777. Section 777 did not apply because J.M. was not already a ward of the court or probationer under section 601 and was not shown to have violated an order of the court or a condition of probation. (See § 777, subd. (a)(1), (2); *In re Paul R.* (1996) 42 Cal.App.4th 1582, 1588.) However, it appears there was no further consequence to the juvenile court's misstatement, and accordingly, the error was harmless.

#### 3. *Discretionary probation conditions*

J.M. argues, the People concede, and we agree that the juvenile court erred by imposing discretionary probation conditions following its commitment of J.M. to DJJ. A juvenile court lacks authority to impose discretionary conditions of probation after committing a minor to DJJ. (*In re Allen N.* (2000) 84 Cal.App.4th 513, 515–516.) Accordingly, we strike the specific conditions directing that J.M. not associate with S.S., have no contact with the victim or her family, stay away from the victim's property, and not annoy, harm, harass or threaten the victim. Additionally, the prohibition against J.M.

---

[11] Thus, we need not reach J.M.'s additional argument that the registration fee violated her equal protection rights, and we deny the related request for judicial notice.

21

possessing a "weapon" until age 30 shall be amended to substitute "firearm" for "weapon," consistent with Penal Code section 29820, subdivision (b).

## F. Ineffective Assistance of Counsel

J.M. argues on appeal that she received ineffective assistance of counsel from Hess. "A defendant claiming ineffective assistance of counsel under the federal or state Constitution must show both deficient performance under an objective standard of professional reasonableness and prejudice under a test of reasonable probability of a different outcome." (*People v. Jones* (1998) 17 Cal.4th 279, 309.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 694 (*Strickland*).) We must "presume that counsel rendered adequate assistance and exercised reasonable professional judgment in making significant trial decisions." (*People v. Holt* (1997) 15 Cal.4th 619, 703.) Thus, where the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal." (*People v. Pope* (1979) 23 Cal.3d 412, 426, overruled in part on another ground in *People v. Berryman* (1993) 6 Cal.4th 1048, 1081, fn. 10.)

J.M. contends her counsel was ineffective because she failed to argue and advise that the crime of torture is incompatible with J.M.'s age and history. As we have rejected the premise of this contention, we find no deficiency in counsel's failure to advance it. (*People v. Price* (1991) 1 Cal.4th 324, 387).

J.M. argues her counsel failed to recognize the significance of Dr. Kelly's opinion that she was a submissive follower triggered by issues relating to her past abuse. But in light of the prosecution's evidence, including the video which depicted J.M. instigating certain acts like commanding Jane to lick the blood off her shoes, counsel could have made a tactical decision to instead show that J.M. was remorseful and willing to take responsibility for her actions in order to obtain leniency from the court. We do not "second-guess reasonable, if difficult, tactical decisions in the harsh light of hindsight." (*People v. Hinton* (2006) 37 Cal.4th 839, 876.)

J.M. argues her counsel failed to advise her of the maximum potential length of her term at the DJJ. But it appears the juvenile court, not counsel, misadvised her in this regard. Even if counsel's performance was deficient for failing to correct the juvenile court, we see no reasonable probability that J.M. would have been *less* inclined to admit to the offense had she been correctly informed about the *shorter* maximum term.

J.M. argues her counsel was deficient in failing to object to the juvenile court's ex parte communications with potential psychiatrists and Dr. Kelly. She contends that, had her counsel objected and obtained an account of these communications, she could have advocated for an evaluation more in line with the purposes of the Juvenile Court Law. In any event, J.M. fails to show any prejudice from the court's communications with psychiatrists who were not actually appointed. As for Dr. Kelly, J.M. complains that his evaluation was skewed to focus on whether J.M. could survive DJJ or another long-term placement. Even so, any perceived deficiency was harmless given the substantial evidence supporting J.M.'s need for long-term treatment and the need for public safety due to the severity of the crime. J.M. does not demonstrate that Dr. Kelly's evaluation was otherwise contrary to the purposes of the Juvenile Court Law, and she concedes it was "defense-favorable." On this record, J.M. fails to show a reasonable probability of a different outcome had Hess objected to the ex parte communications.

J.M. additionally argues her counsel's performance was deficient because she failed to investigate and present facts showing that DJJ commitment was inappropriate for J.M.'s needs. In support, J.M. requests judicial notice of publicly-available statistics for DJJ's Ventura facility regarding incidents of batteries, fights and drugs, inmate ages (showing J.M. is younger than most of the population), and inmate participation in various treatment programs. While we take judicial notice of the fact that DJJ issued this report, entitled "COMPSTAT DJJ Statistical Report – 13 Month" in July 2018 (Evid. Code, § 452, subds. (c), (h)), we see no reasonable probability of a different outcome had the report been submitted below. It is not surprising that the types of incidents identified in the charts would occur at a DJJ facility, and Dr. Kelly already advised that J.M. would be in proximity to criminally-sophisticated juveniles. Moreover,

23

J.M. fails to provide an adequate foundation to interpret the statistics as they relate to treatment at the Ventura facility. Without more, we cannot say J.M. demonstrates a reasonable probability that this data would have led the juvenile court to a different conclusion about the probable benefits of the programs at the Ventura facility.

### G. Pretrial Mental Health Diversion

After the conclusion of appellate briefing, J.M. requested, and we granted, leave to file a supplemental letter brief. In her supplemental briefing, J.M. argues the case should be remanded so that the juvenile court can determine whether to grant her a mental health diversion under Penal Code sections 1001.35 and 1001.36. For the reasons below, we conclude that the mental health diversion law does not apply to juveniles in delinquency proceedings, and that this does not violate equal protection.

#### 1. *Inapplicability of the Mental Health Diversion Law to Juveniles*

Penal Code section 1001.35 specifies that the purpose of the mental health diversion law "is to promote all of the following: [¶] (a) Increased diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety. [¶] (b) Allowing local discretion and flexibility for counties in the development and implementation of diversion for individuals with mental disorders across a continuum of care settings. [¶] (c) Providing diversion that meets the unique mental health and support needs of individuals with mental disorders."

Penal Code section 1001.36, subdivision (a), provides for discretionary "pretrial diversion" to a "defendant" suffering from certain mental illnesses who has been charged in an "accusatory pleading" with a misdemeanor or felony. "Pretrial diversion" is defined in relevant part as "the postponement of prosecution, either temporarily or permanently, at any point in the judicial process from the point at which the accused is charged until adjudication, to allow the defendant to undergo mental health treatment." (*Id.*, subd. (c).)

In order for a defendant to qualify for diversion, the court must be satisfied that all the following requirements are met: the defendant suffers from a mental disorder as

24

identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders," including PTSD (§ 1001.36, subd. (b)(1)(A)); the defendant's mental disorder was a significant factor in the commission of the charged offense, based on any relevant and credible evidence (*id.*, subd. (b)(1)(B)); in the opinion of a qualified mental health expert, the defendant's symptoms of the mental disorder motivating the criminal behavior would respond to mental health treatment (*id.*, subd. (b)(1)(C)); the defendant consents to diversion and agrees to comply with treatment (*id.*, subd. (b)(1)(D), (E)); and the defendant will not pose an "unreasonable risk of danger to public safety," as defined in section 1170.18, if treated in the community, based on the opinions of the district attorney, the defense, or a qualified mental health expert, the defendant's violence and criminal history, the current charged offense, and any other factors that the court deems appropriate (*id.*, subd. (b)(1)(F)).

After ensuring that the defendant meets the above requirements, a trial court may order the defendant into a diversion program for "no longer than two years." (Pen. Code, § 1001.36, subd. (c)(3).) If the defendant performs satisfactorily in the program, the court must dismiss the underlying charges. (*Id.*, subd. (e).)

J.M. argues that the new law, as an ameliorative statute, applies retroactively to cases pending on appeal, and that she meets all six eligibility requirements. The People assert that the statute, which became effective June 27, 2018 (Stats. 2018, ch. 34, § 24)—after J.M.'s admission and the dispositional order—does not apply retroactively. The People further contend that the mental health diversion statute, by its terms, does not apply to juvenile cases, and that even if it did, J.M. has not demonstrated a prima facie case of her eligibility.

Whether or not the new mental diversion law applies to juveniles is a matter of statutory interpretation. Thus, " '[o]ur first step is to scrutinize the actual words of the statute, giving them a plain and commonsense meaning.' " (*Garcia v. McCutcheon* (1997) 16 Cal.4th 469, 476.) "When the statutory language is clear, we need go no further. If, however, the language supports more than one reasonable interpretation, we look to a variety of extrinsic aids, including the objects to be achieved, the evils to be

25

remedied, the legislative history, the statutory scheme of which the statute is a part, and contemporaneous administrative construction, as well as questions of public policy." (*In re Derrick B.* (2006) 39 Cal.4th 535, 539–540 (*Derrick B.*).)

On their face, Penal Code sections 1001.35 and 1001.36 do not state they apply to juvenile proceedings under the Welfare and Institutions Code. Likewise, the legislative history of these code sections makes no mention of their possible applicability to juvenile proceedings.

Penal Code sections 1001.35 and 1001.36 do, however, make frequent use of terminology applicable to "criminal" proceedings. Notably, a juvenile delinquency matter is not criminal in nature (§ 203), and unlike the adult justice system, which seeks to punish, the fundamental purpose of the juvenile justice system is to rehabilitate. (*People v. Vela* (2018) 21 Cal.App.5th 1099, 1104.) Furthermore, as the Legislature recognized in recently amending Proposition 57 to increase the number of minors retained under juvenile court jurisdiction, the juvenile system is very different from the adult system in terms of the mandatory age-appropriate treatment, services, counseling, and education it provides to minors. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1391 (2017–2018 Reg. Sess.) Feb. 16, 2018, p. 4.) "Although courts sometimes consult the Penal Code for guidance in construing procedural statutes appearing in the Welfare and Institutions Code [citations], this doctrine does not sanction the wholesale importation of a procedural Penal Code statute into juvenile court proceedings." (*In re T.C.* (2009) 173 Cal.App.4th 837, 850.)

In *In re M.S.* (2019) 32 Cal.App.5th 1177 (*M.S.*), petition for review filed April 17, 2019 (S255274), a majority of the Court of Appeal held that, due to the distinctions between adult criminal prosecutions and juvenile delinquency proceedings, the mental health diversion law does not apply to juvenile cases. (*M.S.*, at p. 1192.) These distinctions include the circumstances that: a juvenile proceeding is commenced by the filing of a petition, not a criminal complaint; there are no jury trials in juvenile court, but rather, the court presides over jurisdictional hearings; there are no convictions in juvenile court, and instead, a juvenile court's findings that the petition's allegations are

26

true will bring the juvenile within the court's jurisdiction; and there are no sentences in juvenile court, but rather, "a wide variety of rehabilitation alternatives" may be imposed at a disposition hearing. (*Ibid.*) In short, unlike the adult criminal justice system, in juvenile proceedings "there is [no] accusatory pleading, no possibility of conviction, and no punishment." (*Id.* at p. 1193.) *M.S.* further noted that the primary purpose of the mental health diversion law—"to treat the mentally ill adult outside the criminal justice system rather than to punish them inside the system"—is unnecessary for juveniles because the juvenile justice system "is already separate and distinct from the criminal justice system." (*Ibid.*)

J.M. argues *M.S.* was incorrectly decided for two reasons. First, citing *In re Jovan B.* (1993) 6 Cal.4th 801 (*Jovan B.*) and its progeny, J.M. contends *M.S.* failed to address *Jovan B.*'s holding that the use of adult procedural terms in a criminal statute does not demonstrate legislative intent to exclude juveniles from the scope of the statute. Second, J.M. argues *M.S.* failed to address equal protection concerns raised by denial of the benefits of the mental health diversion program to juveniles.

In *Jovan B.*, the California Supreme Court held that Penal Code section 12022.1—which increases the period of imprisonment for a felony committed while the offender is out on bail or on his or her own recognizance (O.R.)—applies to juvenile delinquency proceedings. In so holding, *Jovan B.* concluded that the statute's use of criminal terminology, i.e., information, indictment, complaint, preliminary hearing, and sentencing, "cannot be dispositive of the question of whether the bail/O.R. enhancement applies to juvenile wards." (*Jovan B.*, *supra*, 6 Cal.4th at p. 812.) Observing that Welfare and Institutions Code section 726 expressly adopts the Penal Code's system of enhancements for purposes of computing a juvenile's maximum confinement or commitment, *Jovan B.* determined that section 726 intends to fully apply the enhancement scheme to juveniles "except insofar as the focus of a particular enhancement is manifestly at odds with the principles of juvenile law." (*Jovan B.*, at p. 813.) *Jovan B.* found that the criminal terminology in Penal Code section 12022.1 had

27

"no special technical significance" and that the concerns leading to the enhancement statute applied equally to juvenile and adult offenses. (*Jovan B.*, at pp. 813–814.)

The Supreme Court distinguished *Jovan B.* in *Derrick B.*, *supra*, 39 Cal.4th 535. *Derrick B.* addressed Penal Code section 290, former subdivisions (a)(2)(A), which required sex offender registration for various offenses including sexual battery, and (a)(2)(E), which authorized a court to require registration in connection with unlisted offenses if the court made certain findings and stated reasons for the imposition. In holding that these registration provisions did not apply to juvenile proceedings, *Derrick B.* observed that a different subdivision pertaining to juveniles—Penal Code section 290, former subdivision (d)(3)—contained its own list of specific sex offenses requiring juvenile sex offender registration, and that such list did not include sexual battery. (*Derrick B.*, *supra*, 39 Cal.4th at p. 546.) Hence, unlike the situation in *Jovan B.*, there was "no broader context to expand upon the clear language chosen by the Legislature." (*Derrick B.*, at p. 543.)

Applying these principles to the instant matter, we agree with J.M. that the use of adult criminal terminology in the mental health diversion law is not, by itself, dispositive of whether Penal Code sections 1001.35 and 1001.36 exclude juveniles. But the analysis does not end there. *Derrick B.* instructs us to look to the broader context of the statutory structures involved, especially where, as here, the clear language chosen by Legislature acknowledges the differences between them. In the cases that J.M. cites which follow *Jovan B.*, the Legislature's intent to apply a Penal Code provision to juvenile delinquency proceedings is evinced in the broad context of the statutory schemes and consistent with their existing interplay. Thus, in *Alejandro N. v. Superior Court* (2015) 238 Cal.App.4th 1209, at pages 1223–1226, disapproved on other grounds in *In re C.B.* (2018) 6 Cal.5th 118, 125, 129–130, the court held that the offense reclassification provisions of Penal Code section 1170.18 apply to Welfare and Institutions Code section 602, because section 602 incorporates the entire body of laws defining criminal offenses as the basis for juvenile wardship jurisdiction. And in *In re E.G.* (2016) 6 Cal.App.5th 871, at pages 880–881, Division Five of this district held that Penal Code section 17, subdivision

28

(b)(3), which provides that a "wobbler" offense is a misdemeanor when the court grants probation without imposition of a sentence, applies to juvenile proceedings because Welfare and Institutions Code sections 702 and 726 require a minor's maximum term of confinement be linked to the adult criminal sentencing laws.

The instant matter, however, is more akin to *Derrick B.* because juvenile courts are expressly required to consider " ' "the broadest range of information" in determining how best to rehabilitate a minor and afford him [of her] adequate care.' " (*Carlos J.*, *supra*, 22 Cal.App.5th at p. 7.)  Ensuring access to needed mental health treatment is part of the juvenile court's overarching responsibility to provide minors alleged to be wards with the necessary "care, treatment, and guidance that is consistent with their best interest, that holds them accountable for their behavior, and that is appropriate for their circumstances." (§ 202, subd. (b).).  Moreover, the Juvenile Court Law has its own independent scheme for addressing minors alleged to be wards with serious mental disorders and other emotional and developmental issues.  (§§ 710–713.)

Were we to construe the mental health diversion law as applying to juveniles, it would conflict with or infringe upon these and other provisions specifically contemplated by the Legislature to provide an appropriate and comprehensive course of treatment and rehabilitation for juveniles.  (§§ 202, 710–713, 790–796.)  As discussed, a mental health diversion program under Penal Code section 1001.36 may postpone the adjudication of charges for up to two years.  (Pen. Code, § 1001.36, subd. (c).)  Allowing a juvenile to be siphoned off into the mental health diversion program in this fashion would thus serve to stall a comprehensive disposition that beneficially and timely addresses the juvenile's other rehabilitation needs, such as education, counseling, and discipline.

Moreover, we note the Juvenile Court Law's deferred judgment provisions (§§ 790–796) resemble a diversion scheme in many respects—i.e., providing for "treatment, and rehabilitation efforts" (§ 790, subd. (b)); abating the adjudicatory process (*In re Mario C.* (2004) 124 Cal.App.4th 1303, 1308); and potentially resulting in dismissal of the charges in the wardship petition upon satisfactory completion of the assigned program (§ 793, subd. (c))—except in the critical respect that it is *not* available

29

where the offense charged is enumerated in section 707, subdivision (b), which includes torture. (§ 790, subd. (a)(2); § 707, subd. (b)(23).) In other words, the Legislature, in crafting the deferred judgment program under the Welfare and Institutions Code, did not intend to allow diversion for juveniles charged with offenses listed in section 707, subdivision (b), while the diversion program authorized in the Penal Code does in fact permit diversion for defendants charged with at least some of those offenses.[12] Extending the reach of Penal Code sections 1001.35 and 1001.36 to juveniles would thus conflict with the Legislature's intent to limit the availability of diversion but to timely extend rehabilitative services for certain juveniles. In the absence of a clear expression of legislative intent, we are not persuaded the Legislature meant to abandon such differences between the adult and juvenile statutory schemes. (*Derrick B.*, *supra*, 39 Cal.4th at p. 546.)

J.M. contends the failure to find Penal Code sections 1001.35 and 1001.36 applicable to juveniles will impermissibly result in the imposition of harsher punishments on juveniles. Relying on Welfare and Institutions Code section 726, subdivision (d)(1), she argues that a minor who committed torture would have to serve an entire sentence at DJJ, while an adult who successfully completes the diversion program for the same offense would serve no time at all. That reliance is misplaced. Such circumstances do not violate section 726, subdivision (d)(1), because that statute simply provides that a ward may not be held in physical confinement in excess of the maximum term of imprisonment that *could be* imposed upon an adult convicted of the same offense. (Compare Welf. & Inst. Code, § 607, subd. (f) [discharge upon expiration of two-year period of control or when person attains age 23] with Pen. Code, § 206.1 [torture punishable by life imprisonment].)

---

[12]    For example, Penal Code section 1001.36, subdivision (b)(2), provides that a defendant charged with various enumerated offenses (i.e., murder, voluntary manslaughter, rape, etc.) may not be placed into a diversion program, but torture (Pen. Code, § 206) is not included in the list of offenses precluding diversion.

In sum, we conclude juveniles who are not charged as adults are not statutorily eligible for the mental health program under Penal Code sections 1001.35 and 1001.36. Disallowing adult–focused mental health diversion to juveniles promotes, rather than detracts from, the existing rehabilitative and mental health resources available under the Juvenile Court Law, while properly maintaining the legislatively–enacted distinctions between the two systems.[13]

## 2. *Equal Protection*

J.M. next argues that excluding juveniles from the mental health diversion law available to adult offenders would violate the equal protection guarantees in the Fourteenth Amendment to the United States Constitution and article I, section 7, of the California Constitution.

The constitutional guarantee of equal protection " 'does not preclude the state from drawing any distinctions between different groups of individuals, but does require that, at a minimum, classifications which are created bear a rational relationship to a legitimate public purpose. [Citations.] Moreover, "in cases involving 'suspect classifications' or touching on 'fundamental interests' . . . the state bears the burden of establishing not only that it has a compelling interest which justifies the law but that distinctions drawn by the law are necessary to further its purpose." ' " (*People v. Smith* (2011) 198 Cal.App.4th 415, 434.) Where a disputed statutory disparity does not involve a suspect classification or the alleged infringement of a fundamental interest, equal protection of the law is denied only where there is no " 'rational relationship between the disparity of treatment and some legitimate governmental purpose.' " (*Johnson v. Department of Justice* (2015) 60 Cal.4th 871, 881 (*Johnson*).)

We assume, for purposes of our equal protection analysis, that juveniles in the juvenile justice system are, as a group, similarly situated to adults in criminal court with

---

[13] In light of our conclusion regarding the inapplicability of the mental health diversion law to juveniles, we need not reach the issue of retroactivity, which is currently under review by the Supreme Court. (*People v. Frahs*, review granted Dec. 27, 2018, S252220; *People v. McDonald*, review granted Apr. 17, 2019, S254030.)

31

regard to their interest in accessing mental health treatment and potential pretrial diversion. Although juveniles have not been recognized as a suspect class, J.M. argues the strict scrutiny test applies because a fundamental interest (personal liberty) is at stake. Relying on *People v. Olivas* (1976) 17 Cal.3d 236 (*Olivas*), J.M. essentially reasons that if juveniles are excluded from the application of Penal Code sections 1001.35 and 1001.36, then she will be subject to a longer period of incarceration than similarly-situated adults to whom those code sections apply. We are not persuaded.

At issue in *Olivas* was a statute that granted a trial court discretion to commit a defendant who was between 16 and 21 years of age and was convicted in an adult criminal prosecution to the California Youth Authority for a term longer than he or she would have received had the defendant been sentenced as an adult. *Olivas* concluded that statute triggered application of the strict scrutiny standard because the defendant's fundamental interest in personal liberty was at stake. (*Olivas*, *supra*, 17 Cal.3d at pp. 250–251.) Importantly, however, the Supreme Court later clarified that *Olivas* does not mandate application of the strict scrutiny standard in every equal protection challenge where the adult and juvenile statutory schemes provide different consequences for comparable crimes. (*People v. Wilkinson* (2005) 33 Cal.4th 821, 837 (*Wilkinson*).) " 'There is language in the *Olivas* opinion that emphasizes the narrowness of the holding. For instance, the court noted that [the statute in question] was constitutionally infirm because persons committed under the statute had been "prosecuted as adults, adjudged by the same standards which apply to any competent adult, and convicted as adults in adult courts." [Citation.] This language requires only that the boundaries between the adult and juvenile criminal justice systems be rigorously maintained.' " (*Wilkinson*, at pp. 837–838.) Accordingly, *Olivas* provides no authority for applying the strict scrutiny standard where, as here, the juvenile has always been within the juvenile justice system, and the boundaries between the adult and juvenile systems have been maintained throughout.

Applying the rational basis standard, we conclude J.M. fails to demonstrate an equal protection violation. " 'This standard of rationality does not depend upon whether

32

lawmakers ever actually articulated the purpose they sought to achieve. Nor must the underlying rationale be empirically substantiated. [Citation.] While the realities of the subject matter cannot be completely ignored [citation], a court may engage in " 'rational speculation' " as to the justifications for the legislative choice [citation]. It is immaterial for rational basis review "whether or not" any such speculation has "a foundation in the record." ' [Citation.] To mount a successful rational basis challenge, a party must ' "negative every conceivable basis" ' that might support the disputed statutory disparity. [Citation.] If a plausible basis exists for the disparity, courts may not second-guess its ' "wisdom, fairness, or logic." ' " (*Johnson*, *supra*, 60 Cal.4th at p. 881.)

As discussed, there are material differences between the adult and juvenile justice schemes with regard to their underlying purposes and to the treatment of offenders with mental health issues. (See *ante*, part G.1.) Thus, the Legislature could rationally devise and maintain a separate statutory scheme for juveniles that addresses their rehabilitative needs in delinquency proceedings and provides different criteria for potential diversion. (*Ibid.*) Because J.M. makes no meaningful attempt to negate every conceivable basis that might support the disputed statutory disparities, her equal protection claim fails.

### H. Habeas Corpus Petition (A156093)

#### 1. *Allegations*

J.M. asserts two main grounds for relief. First, she alleges deprivation of her constitutional rights because her admission to count 1 was not voluntary, knowing and intelligent because: she was not advised of and did not understand the specific intent requirement for torture; she was not advised about the lack of value in the plea agreement; and she was not properly advised as to the consequences of her admission. As to this last point, J.M. alleges her admission was based on advice from counsel that there was no minimum amount of time she would need to serve at the DJJ, that she could be released whenever her counselor determined she was ready for release, and that she would likely serve only about half of her term because she would receive a day of credit for every two days served. J.M. alleges this information was inaccurate because program credits are limited and discretionary based on DJJ staff recommendations; there is a

maximum number of credits that can be applied each cycle; and DJJ regulations mandate that she will have to serve substantially all of her seven-year term.

Second, J.M. alleges her confinement is unlawful and in contravention of her constitutional rights because she did not receive effective assistance when her counsel: failed to properly explain the specific intent requirement for torture; advised and consented to an unsupported admission that benefited the prosecution; failed to advise that she could move to withdraw her admission; and failed to investigate and produce evidence that a DJJ commitment was inappropriate for her.  On this last point, J.M. alleges the following events which post-date her commitment:  she has been threatened and assaulted at the Ventura facility by S.S.; she is not receiving adequate treatment or therapy other than completing "worksheets"; her educational opportunities and contact with family are limited; and fights, injuries, suicide attempts and incidents regarding contraband are common.

### 2. *Relevant law*

"Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to *plead* sufficient grounds for relief, and then later to *prove* them.  'For purposes of collateral attack, all presumptions favor the truth, accuracy, and fairness of the conviction and sentence; *defendant* thus must undertake the burden of overturning them.  Society's interest in the finality of criminal proceedings so demands, and due process is not thereby offended.' " (*People v. Duvall* (1995) 9 Cal.4th 464, 474 (*Duvall*).)

A petition for habeas corpus "should both (i) state fully and with particularity the facts on which relief is sought [citations], as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations.  [Citation.]  'Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing.' " (*Duvall*, *supra*, at p. 474.)  In reviewing a habeas corpus petition, we ask whether, assuming the petition's factual allegations are true, the petitioner would be entitled to relief; if no prima facie case for relief is stated, we will summarily deny the

petition.  (*Id*. at pp. 474–475.)  We have requested and received an informal response from the People.  (Cal. Rules of Court, rule 4.551(b).)

"A defendant's guilty plea must be knowing, intelligent, and voluntary."  (*People v. Aguirre* (2011) 199 Cal.App.4th 525, 528 (*Aguirre*).)  "Before deciding whether to plead guilty, a defendant is entitled to 'the effective assistance of competent counsel.' "  (*Padilla v. Kentucky* (2010) 559 U.S. 356, 364.)  The two-part *Strickland* test applies to ineffective assistance challenges to guilty pleas.  The first part requires a defendant to show the deficiency of counsel's performance; while the second part focuses on prejudice and requires the defendant to show "a reasonable probability that, but for counsel's errors, [s]he would not have pleaded guilty and would have insisted on going to trial."  (*Hill, supra,* 474 U.S. at pp. 58–59.)

" 'Surmounting *Strickland*'s high bar is never an easy task,' [citation], and the strong societal interest in finality has 'special force with respect to convictions based on guilty pleas.' [Citation.]  Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences."  (*Lee v. United States* (2017) 137 S.Ct. 1958, 1967; *In re Alvernaz* (1992) 2 Cal.4th 924, 938, 945–946 [petition's allegations not sufficiently corroborated by independent, objective evidence].)  The defendant must provide a declaration or testimony stating that he or she would not have entered into the plea bargain if properly advised, and the court may reject an assertion that is not supported by an explanation or other corroborating circumstances.  (*People v. Martinez* (2013) 57 Cal.4th 555, 565 (*Martinez*).)

### 3.  *Analysis*

Because we have rejected J.M.'s arguments regarding the requisite state of mind for torture, we conclude counsel's failure to advise J.M. in this regard was not constitutionally deficient; nor did it lead to an admission that was not voluntary, intelligent, and knowing.

J.M.'s entire second ground for relief is deficient in that she fails to allege sufficient facts demonstrating prejudice. J.M. simply does not allege she would have rejected the plea deal and insisted on a contested disposition hearing had she been advised of alleged adverse conditions at the Ventura facility. (*Hill, supra,* 474 U.S. at pp. 58–59; *Martinez, supra,* 57 Cal.4th at p. 565.)

J.M. alleges she received ineffective assistance of counsel because she was not advised about the plea deal's lack of value. This conclusory allegation is insufficient to state a prima facie case for relief. J.M.'s "bad deal" argument hinges largely on the premise that she had a strong state of mind defense to torture, a premise we have rejected. J.M. also argues the plea deal had no value because count 2 (assault by means of force plus the enhancement for personal infliction of great bodily injury) was a lesser included offense to count 1, and any custodial time on count 2 would have been stayed under Penal Code section 654. Neither issue is adequately briefed by the parties.[14]

In any event, J.M. does not plead or otherwise show facts tending to prove the plea deal in this case lacked all value. Given the prosecution's evidence, J.M. likely faced DJJ commitment, and she was almost certainly not going to be acquitted on both counts (count 2, with the great bodily injury enhancement, still carried a significant sentence). J.M. provides no declaration from Hess and no explanation of that omission. Consequently, as between the two counts, we have no indication why Hess may have been motivated to recommend J.M.'s admission to torture, including no information about any potential conversations Hess may have had with the prosecution and others. On this record, we cannot say it was constitutionally deficient for Hess to advise J.M. to accept a deal in juvenile court in which J.M. would suffer one less sustained adjudication

---

[14] J.M. relies for her lesser-included-offense argument on dictum in *People v. Martinez* (2005) 125 Cal.App.4th 1035, 1043. The People do not address the issue at all. We note that in *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1456, the court held assault by means of force to produce great bodily injury is not a lesser included offense of torture under the elements test, and *People v. Lewis* (2004) 120 Cal.App.4th 882, 887, held likewise for battery and aggravated battery under the elements and accusatory pleadings tests. The Supreme Court has left the question open. (*People v. Brooks* (2017) 3 Cal.5th 1, 77.)

while hoping for leniency on count 1.  (See *Brady v. United States* (1969) 397 U.S. 742, 756–757 [pleas often influenced by appraisal of prosecution's case and likelihood of leniency].)

Finally, J.M. claims that her admission was based in part on her counsel's incorrect advice as to the consequences of her admission, specifically, the likely effect of DJJ's credit and release policies on the amount of custodial time she would have to serve. But J.M. makes only vague and conclusory allegations about Hess's advice and fails to provide a declaration from Hess.  Consequently, we cannot determine from the pleadings or the available record whether Hess's performance was constitutionally deficient. (Compare *Aguirre*, *supra*, 199 Cal.App.4th at p. 528 [counsel's failure to advise of limitations on ability to earn credits in prison is a collateral consequence of the plea that does not render a defendant's plea not knowing or intelligent] with *People v. Huynh* (1991) 229 Cal.App.3d 1067, 1083 [counsel's erroneous advice regarding the probable minimum prison term before parole eligibility supported a prima facie case for habeas corpus relief].)

For these reasons, we conclude J.M. fails to state a prima facie claim for habeas corpus relief.  The petition is denied.

**DISPOSITION**

We strike the imposition of the registration fee and the discretionary probation conditions from the December 4, 2017, disposition order.  We also order that the prohibition against J.M. possessing a "weapon" until age 30 be amended to substitute "firearm" for "weapon," consistent with Penal Code section 29820, subdivision (b).  The juvenile court is directed to amend its records in a manner consistent with this opinion (see *ante*, part E) and to forward copies of all such pertinent documents to the Director of DJJ.  We also direct the trial court clerk to correct the date on the notice of appeal (see *ante*, p. 8, fn. 3).  In all other respects, the disposition order is affirmed, without prejudice to J.M. raising the issue of additional post-disposition credits in the juvenile court (see *ante*, part D, pp. 20–21).

The petition for a writ of habeas corpus is denied.

                                          _____

                                          Fujisaki, J.

WE CONCUR:

_____

Siggins, P.J.

_____

Petrou, J.

A153296; A156093

In re J.M., a Minor, on Habeas Corpus.

(A153296; A156093)


Trial court:         Sonoma County


Trial Judges:        Hon. Kenneth J. Gnoss


Attorneys:           First District Appellate Project's Independent Case System, Amanda
                     K. Roze for Defendant and Appellant.

                     Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant
                     Attorney General, Jeffrey M Laurence, Senior Assistant Attorney
                     General, Leif M Dautch, Deputy Attorney General, Huy T. Luong,
                     Deputy Attorney General