[No. D040874. Fourth Dist., Div. One. Apr. 1, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
REYNANTE PRE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of parts I, II, III and V.

414

## COUNSEL

Law Offices of Scott M. Schlegel and Scott M. Schlegel for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Tony DaSilva and Laura D. Stilwell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**McCONNELL, P. J.**—Reynante Pre appeals a judgment entered after a jury convicted him of attempted voluntary manslaughter (Pen. Code,[1] §§ 664, 192 subd. (a)), simple mayhem (§ 203), torture (§ 206), first degree robbery (§ 211) and residential burglary (§ 459). He contends that the trial court erred by (1) admitting evidence of his statements to the police, which he contends were taken in violation of his constitutional rights; (2) failing to instruct the jury regarding battery resulting in serious bodily injury, which he contends was a lesser included offense of the torture and the aggravated mayhem charges against him; and (3) responding to a question from the jury by directing the jurors to review the existing instructions. He also contends that (4) there was insufficient evidence to support his conviction for torture and (5) the abstract of judgment erroneously indicates that count 3 charged mayhem when it in fact was a torture charge. We find merit to Pre's last contention and order the abstract of judgment to be corrected. In all other respects, we affirm the judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

On March 26, 1999, G. Rose returned to her apartment in a gated community after grocery shopping. As she exited the elevator on her floor,

---

[1] All statutory references are to the Penal Code unless otherwise specified.

she saw Pre, whom she did not recognize, standing by the elevator. Shesmiled at him and walked to her nearby apartment, unlocked the door, took two steps inside, set down her groceries on the kitchen counter, and waited for the door to "click," indicating it was closed.

When she did not hear the click, she turned around and saw Pre opening the door. She went to the door to block him from opening it further. In broken English, Pre asked, "How you get out garage?" While keeping the door open only about 12 inches, Rose answered, "You drive out the garage." Pre repeated his question or asked how to get out the gate. Rose told him to go to the rental office and began to close the door but Pre had his foot inside the door and resisted her closing the door. He forced his way into her apartment. She stumbled backward, losing her balance, as he entered.

As soon as she regained her balance, Rose kicked Pre in the groin, which slowed him momentarily. Rose testified there was "a major scuffle" while they were both standing. He began to choke her and she responded by trying to choke Pre or gouge his eyes. She then tripped or fell to the floor, landing on her back with Pre over her. He continued to choke her with one hand while he reached behind his back and pulled out a weapon with his other hand. The weapon was later determined to be a car club (a steering wheel locking device).

Pre would have hit Rose's left temple with the car club if she had not put up her left hand to deflect the blow and to try to grab it. Pre wrested the car club from Rose by pulling it in a backward motion; as he did so, the car club came apart and part of it flew off.

Pre grabbed Rose's hands and dragged her down the hall so that they could not be seen through a nearby window. Rose was kicking and struggling. Pre continued to choke Rose until she lost consciousness. When Rose regained consciousness, Pre had her shoulders and head cradled in his lap area, her head elevated and he was biting her right ear. Rose began struggling again but Pre applied pressure to her throat until she passed out again. Rose was afraid Pre was killing her, believing "Why would anybody choke somebody out twice it if were not to kill someone?"

When Rose regained consciousness, Pre had left the apartment and she crawled to the phone and called 911. She later discovered her purse was missing.

As a result of Pre's attack, Rose testified she suffered an injury to her right temple, a fracture of her cheek which caused dental problems, a bite mark on her right hand, fractured ribs on her left side, an injury to an internal organ, a fracture of her left little finger that was later amputated, and a bite to her right

ear, which required over 100 stitches. The photographic exhibits of Rose's injuries additionally show a series of five round bruises between her breasts, bruising on her back and what appears to be a bite mark on her back.

On April 1, 1999, Pre fled to the Philippines (the country of his birth and where he had lived before coming to the United States in 1994) because he was afraid he might be prosecuted for the attack. The next day, police received an anonymous tip that led to their discovery of evidence implicating Pre as Rose's assailant.

Several years after the attack, the police arranged for Pre's extradition to San Diego for prosecution; he arrived late in the evening on January 18, 2002. At that time, the police conducted a videotaped interview with him. At the outset of the interview, the officers advised Pre of his *Miranda* rights; although Pre initially told the officers that he did not understand their advisements that his statements could be used against him and that he was entitled to the presence of an attorney, upon further explanation, Pre indicated that he understood those rights and was nonetheless willing to talk to the officers about the incident. Thereafter, he told the officers that he had taken drugs on the date of the attack and did not remember much of what happened, although he recalled going to the apartment, hurting the victim by hitting her with a bar-type instrument, choking her until she fell to the floor, getting kicked by her and taking her purse.

In April 2002, the district attorney filed an information charging Pre with attempted premeditated murder, aggravated mayhem, torture, first degree robbery and residential burglary. At the outset of trial, Pre moved to suppress the evidence of his statements to the police, arguing that his waiver was not knowing and intelligent because his primary language is Tagalog and the police advised him of his *Miranda* rights in English without an interpreter present. (See *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 36 OhioOp.2d 237].) After reviewing the videotape of the interview, the court found that although Pre indicated that he did not initially understand certain rights being explained to him, he did understand those rights after the officers provided clarification. Based on these findings, the court found that Pre knowingly and intelligently waived his rights after being properly admonished and it denied his suppression motion.

At trial, the prosecution introduced evidence of the facts surrounding the attack, as set forth above. Pre did not present any evidence, but argued in closing that there was no evidence of premeditation or deliberation or of the specific intent element of any of the charges against him. The jury convicted Pre of attempted voluntary manslaughter (as a lesser included offense of attempted murder), simple mayhem (as a lesser included offense of aggravated mayhem), torture, first degree robbery and residential burglary. It also

found that Pre personally used a deadly or dangerous weapon in connection with each of the charges. The court sentenced Pre to a life term (on the torture count) plus 13 years and four months (on the remaining counts and enhancements) and ordered him to pay a $10,000 restitution fine and victim restitution in an amount to be determined.

## DISCUSSION

## I–III*

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

## IV

### *Sufficiency of Evidence—Torture*

Pre contends the evidence is insufficient to support his torture conviction. Specifically, he contends there was insufficient evidence to support an inference he intended to inflict severe and cruel pain or that he inflicted pain for the purpose of revenge, persuasion or for a sadistic purpose. Pre points to the fact he did not use an electrical device or knife to inflict the injuries; did not attempt to humiliate or rape the victim; and did not inflict prolonged pain since the entire attack was relatively brief. He argues "evidence of any intent to cause cruel and extreme pain is entirely absent from the court record" and that only a battery occurred.

The crime of torture is defined by section 206. Section 206 provides: "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." "As the statute states, torture has two elements: (1) a person inflicted great bodily injury upon the person of another, and (2) the person inflicting the injury did so with specific intent to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose." (*People v. Baker* (2002) 98 Cal.App.4th 1217, 1223 [120 Cal.Rptr.2d 313].)

The torture offense contained in section 206 was adopted by the voters to "fill[] a gap in existing law dealing with extremely violent and callous criminal conduct." (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1573 [18 Cal.Rptr.2d 395].) "[T]orture as defined in section 206 focuses on the mental

---

*See footnote, *ante,* page 413.

state of the perpetrator and not the actual pain inflicted." (*People v. Hale* (1999) 75 Cal.App.4th 94, 108 [88 Cal.Rptr.2d 904].)

■ Section 206 does not require permanent, disabling, or disfiguring injuries; "[s]ection 206 only requires 'great bodily injury as defined in Section 12022.7' . . . . 'Abrasions, lacerations and bruising can constitute great bodily injury.' " (*People v. Hale, supra,* 75 Cal.App.4th at p. 108; *People v. Jung* (1999) 71 Cal.App.4th 1036, 1042 [84 Cal.Rptr.2d 5].) Further, section 206 expressly provides that the offense "does not require any proof that the victim suffered pain." (§ 206.) The statutory requirement of an intent to inflict "cruel" pain and suffering has been interpreted to require that the defendant had an intent to inflict extreme or severe pain. (*People v. Aguilar* (1997) 58 Cal.App.4th 1196, 1202 [68 Cal.Rptr.2d 619].) ■ As used in the statute, "sadistic purpose" encompasses the common meaning, i.e., " 'the infliction of pain on another person for the purpose of experiencing pleasure.' " (*Id.* at p. 1203.)

■ The intent required for a conviction of the offense contained in section 206 differs from the intent required for murder by torture since the torture offense in section 206 does not require that the defendant act with premeditation or deliberation or that the defendant have an intent to inflict *prolonged* pain. (*People v. Hale, supra,* 75 Cal.App.4th 94, 107; *People v. Aguilar, supra,* 58 Cal.App.4th at p. 1204 ["[S]ection 189 does not itself define the crime of murder by torture" whereas "virtually the entire text of section 206 defines the crime of torture, and the statutory language does not require the intent to inflict prolonged pain."].) **(4)** Thus, the brevity of the attack does not, in and of itself, compel a conclusion the defendant must be acquitted of torture. (See *People v. Hale,* at pp. 107–108 [rejecting defendant's argument that the "brevity of the attack preclude[d] his harboring an intent to torture"].)

■ Intent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1245 [75 Cal. Rptr. 2d 40]; *People v. Walls* (1978) 85 Cal.App.3d 447, 452 [149 Cal.Rptr. 460].) Intent to cause cruel or extreme pain can be established by the circumstances of the offense and other circumstantial evidence. (*People v. Jung, supra,* 71 Cal.App.4th at p. 1043; *People v. Hale, supra,* 75 Cal.App.4th at p. 106.)

"[S]everity of a victim's wounds is not necessarily determinative of intent to torture" since "[s]evere wounds may be inflicted as a result of an explosion of violence [citations] or an 'act of animal fury' " rather than an intent to inflict pain for revenge, extortion, persuasion, or other sadistic purpose. (*People v. Mincey* (1992) 2 Cal.4th 408, 432 [6 Cal.Rptr.2d 822, 827 P.2d

388]; see also *People v. Davenport* (1985) 41 Cal.3d 247, 268 [221 Cal.Rptr. 794, 710 P.2d 861], noting that the Supreme Court had "reversed convictions based on a torture-murder theory in spite of the extreme gruesomeness of the crime where the evidence showed that the killing resulted from 'an explosion of violence' or 'an act of animal fury produced when inhibitions were removed by alcohol.' ") "It does not follow, however, that because the severity of the victim's wounds is not necessarily determinative of the defendant's intent to torture, the nature of the victim's wounds cannot as a matter of law be probative of intent. Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense. [Citation.] The condition of the victim's body may establish circumstantial evidence of the requisite intent." (*People v. Mincey,* at p. 433.)

" 'The role of an appellate court in reviewing the sufficiency of the evidence is limited. The court must "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] [¶] . . . But it is the *jury*, not the appellate court, which must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.] Therefore, an appellate court may not substitute its judgment for that of the jury.' " (*People v. Sanchez* (1998) 62 Cal.App.4th 460, 468 [72 Cal.Rptr.2d 782], quoting *People v. Ceja* (1993) 4 Cal.4th 1134, 1138–1139 [17 Cal.Rptr.2d 375, 847 P.2d 55].)

█ We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119]; *In re Manuel G.* (1997) 16 Cal.4th 805, 822 [66 Cal.Rptr.2d 701, 941 P.2d 880].) We do not reweigh the evidence, resolve conflicts in the evidence, or reevaluate the credibility of witnesses. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103]; *People v. Green* (1997) 51 Cal.App.4th 1433, 1437 [59 Cal.Rptr.2d 913].) "Before a judgment of conviction can be set aside for insufficiency of the evidence to support the trier of fact's verdict, it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support it." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765 [24 Cal.Rptr.2d 321].) Convictions are seldom reversed based on insufficiency of the evidence.

In this case, the victim did not remember Pre making any statements other than his initial questions about how to exit the garage or the gated area, questions that do little to reveal Pre's intent except perhaps his intent to gain entry to Rose's apartment by having her keep the door open while he talked

with her. He had no preexisting relationship with her. During the initial struggle while Pre and Rose were standing and when he attempted to hit her with the car club and later when he dragged her down the hall, a reasonable jury could infer a variety of different intents. The Attorney General argues a jury could find Pre had an intent to inflict severe pain in retaliation for Rose's kicking his groin. Alternatively, the evidence could support inferences that Pre was attempting to subdue Rose as part of an intent to rob her or that he believed he needed to defend himself from Rose who was attempting to hurt him. Given Pre's subsequent conduct, a reasonable jury also could have inferred that Pre's intent from the moment he entered the apartment was to inflict severe pain on an unknown woman for his own warped sense of sadistic pleasure. Pre could have had multiple objectives during the initial confrontation and struggle.

While various intents could be ascribed to Pre's initial entry and attack, once he had subdued Rose by choking her into unconsciousness, a reasonable jury could have concluded that his subsequent use of force against Rose was not pursuant to a need to subdue Rose as part of a belief in the need for self-defense or pursuant to a robbery. A reasonable jury could have concluded Pre had neither intent; if Pre's intent was self-defense or robbery, while Rose was unconscious he would have taken her purse and left or bound her while he ransacked the apartment. Pre did neither. Instead, while Rose was unconscious, he changed his position, cradled her head and shoulders in his lap, and proceeded to bite her ear. He did not merely nibble her ear, a sensitive body part, but bit it so severely that he nearly bit through her ear. The injury he inflicted required over 100 stitches to repair. This was bizarre conduct, not necessitated by any attempt to rob her or belief in self-defense. A reasonable inference is that Pre bit her ear pursuant to an intent to inflict extreme pain on his victim for his own sadistic pleasure.

Moreover, once Rose regained consciousness, Pre choked her again until she passed out. Further, Rose suffered other injuries that she did not describe as occurring during the initial struggle, including what appears to be a bite mark on her back. A reasonable jury could have concluded these injuries were inflicted when Rose was unconscious, that is, during a period when Pre could have left the apartment if his intent had only been to take her purse or to defend himself against her attack and that these injuries were inflicted for the purpose of inflicting severe pain for revenge or Pre's sadistic pleasure.

Pre argues his torture conviction lacks sufficient evidence because he did not resort to using weapons, did not engage in any sexual assault or humiliating acts, and although he "had an uninterrupted opportunity to intentionally inflict severe and prolonged physical pain on . . . Rose . . . [he] did not do so."

Initially, we note Pre did use a weapon (a car club). Second, a reasonable jury could conclude he did take advantage of the opportunity he had created to inflict pain on the victim; after he choked the victim into unconscious, he took the opportunity to inflict additional injuries. Third, to the extent Pre argues and the dissent finds that Pre's conduct did not constitute torture because other cases, such as *People v. Singleton* (1980) 112 Cal.App.3d 418 [169 Cal.Rptr. 333], involved more extreme conduct or because Pre did not inflict prolonged pain, we disagree. This position is not only at odds with decisions of the Court of Appeal interpreting the torture statute, but also with statements of our Supreme Court.

■ The Court of Appeal in *People v. Barrera, supra*, 14 Cal.App.4th 1555, 1573, expressly rejected the argument the torture offense in section 206 was intended only to encompass offenses with conduct similar to the *Singleton* case. Other Court of Appeal decisions have similarly found little utility in looking to the facts of other torture cases when faced with assessing the sufficiency of the evidence. (See *People v. Baker, supra,* 98 Cal.App.4th at pp. 1224–1225 [rejecting argument that "the cases in which torture convictions have been affirmed involve[d] evidence demonstrating 'uniquely vicious behavior' or 'evilness' not present" in the defendant's case]; *People v. Hale, supra*, 75 Cal.App.4th 94, 107 [rejecting argument that the evidence was insufficient because the defendant's acts were not so egregious as those in other torture cases]; *People v. Jung, supra*, 71 Cal.App.4th 1036, 1043 [rejecting argument that evidence was insufficient because other victims suffered more, explaining, "[t]hat other victims of torture may have suffered more than the victim in this case sheds no light on the sufficiency of the evidence of defendants' intent to cause [the victim] severe pain and suffering"].) We agree that a comparison to the facts in other cases is of little value in assessing the sufficiency of the evidence in a particular case. Thus, the fact that Pre did not inflict more severe or additional injuries (such as raping the victim) or did not require the victim to engage in humiliating acts does not undermine a conclusion the evidence was sufficient in this case.

■ The dissent asserts the "application of the [torture] statute has expanded, by judicial accretion, to any assault in which the victim suffers 'great bodily injury' where the jury infers an intent to inflict cruel and extreme pain, regardless of whether the assailant's conduct was extremely violent and callous." (Dis. opn, *post*, at p. 426.) This characterization disregards the fact that for a torture conviction the jury must not only find the defendant inflicted great bodily injury but also that the defendant intended to do so for the purpose of revenge, extortion, persuasion, or some other sadistic purpose. This additional intent requirement distinguishes the offense of torture from an aggravated assault and is clearly a matter for a jury to determine. Here, for example, there was evidence indicating the initial struggle had ended at the time Pre bit the victim's ear; he did not bite her ear while she was resisting

but only after he had choked her into unconsciousness and moved her body into his lap. This evidence was sufficient to support an inference Pre did not merely engage in an assault but had a separate sadistic purpose to inflict great bodily injury and pain when he bit her ear.

■ Further, while the California Supreme Court has not specifically addressed the crime of torture contained in section 206, it has made it clear that the purpose of additional punishment for conduct amounting to torture is not based on the victim experiencing extreme pain or suffering or the presence of extreme violence, since extreme violence may exist in circumstances involving other conduct such as an explosion of violence. (*People v. Mincey, supra*, 2 Cal.4th 408, 432.) Rather, the Supreme Court has explained the additional punishment is imposed because the defendant's *intent* to inflict pain for a sadistic purpose is deserving of additional punishment. (*People v. Davenport, supra*, 41 Cal.3d 247, 267–268; *People v. Wiley* (1976) 18 Cal.3d 162, 168–169 [133 Cal.Rptr. 135, 554 P.2d 881].) ■ The focus must be on the defendant's intent to inflict pain for revenge, extortion, persuasion or for any sadistic purpose rather than on the severity of the injuries or the duration of the attack.

■ The Supreme Court has indicated that the nature and extent of the injuries may be considered in assessing the defendant's intent. The nature and extent of the injuries here, although perhaps not as severe as those in the *Singleton* case, were consistent with the jury's finding of torture, in particular, the apparent bite on the victim's back and the ear injury. A jury could infer these injuries were inflicted while the victim was unconscious and constituted sadistic acts that were not part of a mere assault.

■ Finally, contrary to Pre's assertion and the conclusion of the dissent that characterizing his actions against Rose as torture "is to redefine, and minimize, the gruesome and sadistic nature of torture," we conclude Pre's violent and depraved conduct clearly falls within the ambit of the torture statute. The evidence supports a finding that Pre selected a woman unknown to him, forced entry into her apartment, attacked her viciously when she resisted, twice choked her into unconsciousness, and then intentionally inflicted great bodily injury and cruel and extreme pain while she was helpless and for no other apparent purpose than revenge or sadistic pleasure. This is exactly the type of nightmarish situation the torture statute, section 206, was intended to address.

The evidence was abundantly sufficient to support Pre's conviction of torture.

V*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The superior court is ordered to amend the abstract of judgment to show count 3 as a torture charge, and forward a certified copy to the Department of Corrections. In all other respects the judgment is affirmed.

Benke, J., concurred.

**McINTYRE, J.,** Concurring and Dissenting.—I agree with the majority's analyses of Pre's contentions on appeal, except as to the sufficiency of the evidence to support the jury's finding that Pre acted with the specific intent to cause cruel or extreme pain or that he acted for revenge, persuasion or any sadistic purpose. On this latter issue, I respectfully dissent.

The crime of torture was codified in California in June 1990, when the California electorate passed Proposition 115 in response to the facts in *People v. Singleton* (1980) 112 Cal.App.3d 418 [169 Cal.Rptr. 333]. (*People v. Jung* (1999) 71 Cal.App.4th 1036, 1044 [84 Cal.Rptr.2d 5] (dis. opn. of Armstrong, J.).) In that case, Singleton kidnapped and sexually abused his victim, then chopped off her hands and dumped her in a ditch in a remote location. He was later charged with and convicted of attempted murder, mayhem, kidnapping and multiple sex crimes, which resulted in a sentence of fourteen years, four months in prison. Singleton was paroled after having served just seven years in prison and thereafter the new crime of torture was included in "Proposition 115 'to insure that crimes such as Singleton's receive a minimum punishment of life imprisonment.' " (*Id.* at p. 1048, quoting Sen. Com. on Judiciary, Assem. Com. on Public Safety, Joint Hearing on Crime Victims Justice Reform Act (1990) pt. 3, at p. 005.)

Penal Code section 206 was not intended to alter the existing legal definition of torture, but was codified to ensure that conduct amounting to torture would be punished by no less than life in prison even in situations where the victim survives, as in *Singleton*. (*People v. Barrera* (1993) 14 Cal.App.4th 1555, 1564 [18 Cal.Rptr.2d 395].) The majority recognizes as much, noting that the adoption of Penal Code section 206 was intended "to fill[] a gap in existing law dealing with extremely violent and callous criminal conduct." (Maj. opn, *ante*, at p. 419, quoting *People v. Barrera, supra*, 14 Cal.App.4th at p. 1573.)

---

See footnote, *ante*, page 413.

Notwithstanding the original intent underlying the adoption of Penal Code section 206, the application of the statute has expanded, by judicial accretion, to any assault in which the victim suffers "great bodily injury" where the jury infers an intent to inflict cruel and extreme pain, regardless of whether the assailant's conduct was extremely violent and callous. (See, e.g., *People v. Hale* (1999) 75 Cal.App.4th 94, 108 [88 Cal.Rptr.2d 904] [holding that the crime of torture focuses on the mental state of the perpetrator, not on whether actual pain was inflicted].) Under such an application of the statute, virtually any aggravated assault proscribed by Penal Code section 245 that results in great bodily injury may qualify as torture under Penal Code section 206; if the jury infers the requisite intent from the defendant's conduct, the defendant will be subject to a life sentence rather than a two- to four-year sentence applicable to an aggravated assault conviction (Pen. Code, § 245, subd. (a)), even if the crime was not particularly heinous and the injuries were not particularly substantial. This is not what the voters intended in passing Proposition 115. In my view, a part of our function as a reviewing court is to see that the law is applied in accordance with its purpose and the intent underlying it.

As the majority opinion points out, our review of the sufficiency of the evidence to support the jury's verdict is limited. However, I disagree with the majority's conclusion that this limitation precludes us from finding that a reasonable trier of fact could not have inferred the requisite specific intent from the circumstances of Pre's attack on Rose. In fact, no existing published case has recognized the crime of torture arising out of conduct similar to what Pre engaged in here. Without minimizing the nature of Pre's attack on Rose and recognizing that Pre's conduct may be viewed as somewhat unusual, I nonetheless conclude that the jury could not reasonably infer that Pre acted with the intent to cause cruel or extreme pain or for revenge, persuasion or any sadistic purpose from his conduct, which was neither "extremely violent and callous," nor comparable to that involved in *Singleton*. A reasonable juror could not infer from the circumstances surrounding his attack on Rose that Pre intended to inflict cruel or extreme pain. Characterizing Pre's actions against Rose as torture "redefine[s], and minimize[s], the gruesome and sadistic nature of torture, which has long been recognized as among the most heinous of human conduct . . . ." (*People v. Jung, supra,* 71 Cal.App.4th at p. 1049 (dis. opn. of Armstrong, J.).) For these reasons, I would reverse Pre's conviction of torture.

Appellant's petition for review by the Supreme Court was denied June 30, 2004.