Filed 6/3/24  P. v. Williams CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DESMOND ALEJANDRO WILLIAMS,<br><br>    Defendant and Appellant. | D081598<br><br><br>(Super. Ct. No. SCD289454) |

APPEAL from a judgment of the Superior Court of San Diego County, Jeffrey F. Fraser, Judge.  Affirmed as modified.

Athena Shudde, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Laura Baggett and Robin Urbanski, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Desmond Alejandro Williams of the crimes of torture (Pen. Code,[1] § 206) and simple mayhem (§ 203). The trial court sentenced him to a term of life imprisonment for the torture count, and imposed and stayed a concurrent term of four years on the mayhem count. On appeal, he contends there is insufficient evidence to support the torture conviction and asserts two sentencing errors. We agree with his contention the court erred in imposing a concurrent term on the mayhem count after finding section 654 applied. We shall modify the judgment to strike the trial court's statement in its oral imposition of sentence that the sentence on count 2 is concurrent. As modified, we affirm the judgment.

## BACKGROUND

Williams was a transient who stayed in the riverbed area of the San Diego River in Mission Valley. One night in November 2010, Williams returned to his tent to find that "everything was slashed with knives, ripped open, [and] broken." Items were stolen, including Williams's "bong." It appeared "the place had been ransacked."

Williams concluded another transient named Kenneth P. was the culprit. He was angry. In the transient community, damaging a person's tent is a sign of disrespect. There had also been prior "social frustrations" between Williams and Kenneth. Williams "wanted to get revenge."

Williams went looking for Kenneth. He got on the trolley with a group of four others to confront Kenneth, including a man named "Yuki," Yuki's girlfriend, Summer L. (Williams's girlfriend), and Alexander R. There "was a lot of adrenaline [in the group] getting ready to go" find Kenneth. Williams

---

[1]     Undesignated statutory references are to the Penal Code.

wanted "vengeance," and was saying things like, "I'm going to get him. I'm going to do it. He's going to get what he deserves."

The group got off the trolley near Qualcomm Stadium and found Kenneth's tent near the riverbed in another encampment area. Kenneth was sleeping on a couch inside the tent; his tentmates, Christopher F. and Aaron L., were asleep on the floor.

Williams had come up with a plan for the three women in his group to separate Christopher and Aaron while he and Yuki "took care of Kenneth." They "slowly walked" up to Kenneth's tent. Somebody in the group told Christopher and Aaron to exit the tent. When they complied, one of the women told them, "Stay out of it, or you're getting pepper-sprayed." Williams and Yuki "rush[ed] in" and Yuki took down the tent by striking the tent poles with a metal baseball bat. The tent collapsed.

Kenneth was "trapped in the tent." He was "freaking out" and yelling, "What's going on? What's happening?" Williams and Yuki shouted at him, "You're going to get what's coming to you. You're going to get your ass beat. . . . This is what you get." Yuki tossed the bat to Williams. Williams started "whacking" Kenneth with the bat, while yelling, "You got what's coming to you. How dare you mess with us, take our crap." Kenneth was screaming, "Help me. Stop."

Williams struck Kenneth with the bat at least a dozen times, including at his back, the core of his body, and his head. When he was done with the bat, he tossed it to Yuki and asked for his hatchet. Williams raised the rusty hatchet in the air and told Kenneth, "Now you're going to get what's coming, mother fucker," and swung it at Kenneth. Williams struck Kenneth with the blunt side of the hatchet somewhere between 15 and 17 times. Kenneth, still trapped in the tent, was screaming.

3

At some point, Williams switched to the bladed side of the hatchet and told Kenneth, "Here comes the pointy end, mother fucker." When Williams hit Kenneth with the bladed side of the hatchet, it "caused a lot of screaming" by Kenneth. Kenneth then got out of from under the "mound of tent" and began running toward the river. Williams, however, swung the blade one more time at Kenneth's ankles. Kenneth fell into the river. Williams and his group left.

According to Alexander, they were at the encampment "close to an hour" and Williams's attack on Kenneth "felt like a long time," though when pressed, she estimated it was about 15 minutes or less. When the group first went to find Kenneth, Alexander thought there would be a fight "with fists and kicks." She "didn't think it would turn into [her] hearing someone scream for their life."

Kenneth was admitted to a hospital that night. He had a fractured rib, a punctured and bruised lung with pneumothorax (an air leak into the space between the lungs and chest wall), and several lacerations, including "a deep laceration" to his right ankle. After he underwent surgery in the emergency department, he developed an infection at the site of the ankle wound that went down into the tendon. Although the infection had spread to the tendon, the admitting trauma surgeon opined it was "quite possible" the tendon was injured at the time the ankle was cut. Kenneth went back for surgery for "a complex wound care regimen." He remained hospitalized for two weeks and underwent a total of four surgeries.

When detectives interviewed him at the hospital on the morning of December 1, Kenneth was "in a lot of pain" and "very shaken" by the attack. He struggled to speak, "constantly grimacing" throughout the conversation. He told detectives he had been shot in a war but "thought that he was going

4

to die" the night Williams attacked him. The detectives observed "very distinctive bruising across his back in the shape of a bat mark."

Ten years later, Kenneth still suffered physical and emotional trauma from the attack. He had a 6-inch scar at his ankle from the hatchet wound. He had ligament and tendon damage that left him with an unsteady gait; nerve damage that had caused some loss of mobility; and back pain. He also suffered from "night terrors."

The jury found Williams guilty of torture (§ 206; count 1) and, having acquitted him on aggravated mayhem (§ 205; count 2), convicted him on the lesser included offense to count 2 of simple mayhem (§ 203).

DISCUSSION

I.

*Substantial Evidence Supports A Conviction for Torture*

Penal Code section 206 provides, "Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶] The crime of torture does not require any proof that the victim suffered pain." As the statute states, the crime of torture has two elements: " '(1) the infliction of great bodily injury on another; and (2) the specific intent to cause cruel or extreme pain and suffering for revenge, extortion or persuasion or any sadistic purpose." (*People v. Burton* (2006) 143 Cal.App.4th 447, 451–452 (*Burton*); accord *People v. Massie* (2006) 142 Cal.App.4th 365, 370–371 (*Massie*); *People v. Pre* (2004) 117 Cal.App.4th 413, 419 (*Pre*).)

Given Kenneth's severe injuries, Williams does not dispute he inflicted great bodily injury on Kenneth. The crime of torture "does not require permanent disabling, or disfiguring injuries" (*Pre*, *supra*, 117 Cal.App.4th at

5

p. 420), although the evidence establishes Kenneth sustained permanent and disabling injuries from the hatchet cut to his ankle. Section 206 requires only "great bodily injury as defined in [s]ection 12022.7," and, here, Kenneth's less severe injuries such as abrasions, lacerations and bruising also constitute great bodily injury. (See *Pre*, at p. 420; *People v. Jung* (1999) 71 Cal.App.4th 1036, 1042 (*Jung*).)

Williams's sole claim is the evidence was insufficient to establish the second element that his intent was to cause cruel or extreme pain and suffering. We disagree.

"Courts have interpreted intent to inflict 'cruel' pain and suffering as intent to inflict extreme or severe pain." (*Burton*, *supra*, 143 Cal.App.4th at p. 452; accord *Jung*, *supra*, 71 Cal.App.4th at p. 1041.) Because the intent with which a person acts is rarely susceptible of direct proof, "the circumstances of the offense can establish the intent to inflict extreme or severe pain." (*Burton*, at p. 452; *Massie*, *supra*, 142 Cal.App.4th at p. 371; *Pre*, *supra*, 117 Cal.App.4th at p. 420.)

The second element of torture also requires the act be committed for "revenge, extortion, persuasion or for any sadistic purpose." (§ 206.) The first three are self-explanatory. "Sadistic purpose encompasses the common meaning, the infliction of pain on another person for the purpose of experiencing pleasure." (*Massie*, *supra*, 142 Cal.App.4th at p. 371 [cleaned up].) "While sadistic pleasure is often sexual, the statute does not require a sexual element." (*Ibid.*) Stated another way, "Black's Law Dictionary defines 'sadism' as 'a form of satisfaction . . . derived from inflicting harm on another.' (Black's Law Dict. (5d ed.1979) p. 1198.)" (*Burton*, *supra*, 143 Cal.App.4th at p. 453.)

6

Our task here is to "review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.) We apply the same standard in cases where the prosecution relies mainly on circumstantial evidence. (*People v. Stanley* (1995) 10 Cal.4th 764, 792.) Because it is the jury, not the appellate court, that must be convinced of the defendant's guilt beyond a reasonable doubt, if the circumstances reasonably justify the jury's findings, "the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [cleaned up].)

We first note that Williams's approach in challenging the sufficiency of the evidence on his intent to torture is unpersuasive. He cites to cases decided under section 206 and argues they reveal that the acts found sufficient to establish the requisite intent "involve conduct that is far more egregious, directed, deliberate, and designed than is present in this case." By comparison to those cases, he asserts his attack of Kenneth is "more akin to those cases involving serious battery." Like courts before us, we reject this argument. (See *Pre, supra*, 117 Cal.App.4th at p. 423 ["Other Court of Appeal decisions have similarly found little utility in looking to the facts of other torture cases when faced with assessing the sufficiency of the evidence."].)

As one court put it: "Torture . . . does not require a specific modality. It requires the infliction of great bodily injury with the 'intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose.' (§ 206.) There is no question there are cases in which the acts of torture were more gruesome. However, '[w]hen we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts.' " (*People v. Odom* (2016) 244 Cal.App.4th 237, 248, quoting *People v. Thomas* (1992) 2 Cal.4th 489, 516); accord *Jung, supra*, 71 Cal.App.4th at p. 1043 ["That other victims of torture may have suffered more than the victim in this case sheds no light on the sufficiency of the evidence of defendant[']s intent to cause [the victim] severe pain and suffering."].)

Moreover his reliance on *People v. Mungia* (2008) 44 Cal.4th 1101 as an example of evidence determined to be insufficient to prove torture is misplaced. *Mungia* is a murder case with a special circumstance allegation the murder was intentional and involved the infliction of torture (§§ 187, 189, 190.2, subd. (a)(18).) (*Mungia*, at pp.1106–1107.) "The intent required for torture as defined in section 206 is not identical to the intent required for torture murder under section 189. Torture under section 206 does not require premeditation and deliberation, and it does not require an intent to inflict prolonged pain. The formation of intent to inflict injury and the actual infliction of the injury can follow instantaneously." (*Massie, supra*, 142 Cal.App.4th at p. 372 [cleaned up]; accord *Pre, supra*, 117 Cal.App.4th at p. 420.)

Thus Williams's argument the evidence is insufficient here because the circumstances do not show "any planning, directed, deliberate and designed pattern, exactitude or 'scientific air' . . . to the injuries" is unavailing. So too

8

is his argument that because Williams's "brutality was not prolonged" and "went very quick," Williams's violence must be "an irrational act of assaultive rage." Like the *Massie* court, we reject the contention that evidence of anger precludes a conviction for torture under section 206. (*Massie*, *supra*, 142 Cal.App.4th at p. 372.) "An explosion of anger may be inconsistent with the reflection necessary for premeditation and deliberation [required for first degree murder], but it is not at all inconsistent with an intent to inflict cruel or extreme pain and suffering, which may be the result of 'mere unconsidered or rash impulse hastily executed.' " (*Ibid.*)

Absent direct evidence of the intent to torture, a jury can look to the circumstances of the offense to infer the intent to inflict extreme or severe pain. Although not determinative, "[a] jury may consider the severity of the wounds in determining whether defendant intended to torture." (*Burton*, *supra*, 143 Cal.App.4th at p. 452; *Massie*, *supra*, 142 Cal.App.4th at p. 371). " '[S]carring and disfigurement constitute strong circumstantial evidence of intent to inflict severe pain and suffering.' " (*Burton*, at p. 452.) A jury may also "infer intent to cause extreme pain from a defendant who focuses his attack on a particularly vulnerable area, such as the face, rather than indiscriminately attacking the victim." (*Ibid.*) Further still, a defendant's threats to the victim may also be evidence of his intent to cause extreme or severe pain. (*Ibid.*)

Here, the jury could find all these circumstances existed and reasonably infer from them that Williams intended to inflict extreme or severe pain on Kenneth. After he trapped Kenneth inside the collapsed tent, Williams repeatedly struck him with a metal baseball bat to his body, including the head, back, and core. He did so with enough force to break a rib and puncture and bruise a lung, and to leave "very distinctive bruising across

9

his back in the shape of a bat mark." Kenneth screamed for help and pleaded for Williams to stop. He did not. After he beat Kenneth with the bat, with at least a dozen strikes, he switched to a rusty hatchet and told Kenneth, "Now you're going to get what's coming, mother fucker." He struck Kenneth with the blunt side of the hatchet, according to Alexander, 15 to 17 times. That was not enough. Williams then switched to the bladed side and before striking Kenneth again, taunted him—"Here comes the pointy end, mother fucker." This caused "a lot of screaming" by Kenneth. And when Kenneth was able to escape the collapsed tent to run, Williams—for good measure—hacked his ankle with the hatchet. Despite Kenneth "scream[ing] for his life," Williams's attack was brutal and accompanied by gratuitous taunts to the victim. The attack scarred Kenneth, physically and emotionally. A jury could reasonably infer from the nature of the attack, including Williams's choice of weapons, his repetitive and relentless infliction of pain, and the gratuitous taunts, that he intended to inflict extreme pain and suffering on Kenneth.

Last, there can be little question on this record that Williams inflicted great bodily injury on Kenneth for the purpose of vengeance. His companions testified he wanted to revenge Kenneth's alleged destruction of his tent and theft of his things, including his bong. The jury could also reasonably infer from the circumstances we have already described that he inflicted great bodily injury on Kenneth for a sadistic purpose, that is he derived satisfaction from inflicting harm on another. (See *Burton*, *supra*, 143 Cal.App.4th at p. 453.)

The torture conviction was supported by substantial evidence.

10

II.

*Finding Section 654 Applicable to the Mayhem Count, the Trial Court Should Not Have Imposed a Concurrent Term*

The trial court selected the torture count as the principal term and imposed life imprisonment (§ 206.1), making him eligible for parole after seven years (§ 3064, subd. (a)). It agreed with defense counsel that Williams committed both crimes of torture and simple mayhem with a single "intent" and that section 654 applied. The court selected the middle term of four years for the mayhem count but then ran it concurrent with sentence on the torture count and stayed the term. We agree with Williams the concurrent term was error.

Subdivision (a) of section 654 provides, "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Section 654 bars double punishment, *including concurrent sentences*, for a course of conduct constituting one indivisible transaction with one criminal objective. (See *Neal v. State of California* (1960) 55 Cal.2d 11, 19 (*Neal*); *People v. Alford* (2010) 180 Cal.App.4th 1463, 1468 (*Alford*) ["Imposition of concurrent sentences is not the correct method of implementing section 654, because a concurrent sentence is still punishment."]; *People v. Lee* (1980) 110 Cal.App.3d 774, 785.) Where section 654 prohibits multiple punishment, the trial court must stay execution of sentence on the convictions for which multiple punishment is prohibited. (*Alford*, at pp. 1468–1469.)

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one

11

objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting *Neal, supra,* 55 Cal.2d at p. 19; accord *People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.) "Whether section 654 applies in a given case is a question of fact for the trial court, which is vested with broad latitude in making its determination." (*Jones,* at p. 1143.) "Its findings will not be reversed on appeal if there is any substantial evidence to support them." (*Ibid.*) We review the trial court's determination in the light most favorable to the People and presume the existence of every fact the trial court could reasonably deduce from the evidence. (*Ibid.*)

At sentencing, the People argued section 654 did not apply and requested the court impose a consecutive term for the mayhem count. The People argued Williams had different intents when he committed torture and mayhem, stating in their sentencing memorandum: "Defendant, in order to cause cruel and extreme pain and suffering for the purpose of revenge, repeatedly beat [Kenneth] with a metal baseball bat. After beating [Kenneth] for several minutes, Defendant paused, demanded his hatchet, and after being given his desired weapon, proceeded to shout 'here comes the hatchet.' Defendant then proceeded to swing the hatchet at [Kenneth] multiple times with the clear intent to maim, disable, and permanently disfigure."

Defense counsel disagreed and pointed out the jury acquitted Williams of aggravated mayhem, necessarily finding the evidence was insufficient to prove a specific intent to maim.[2] In the defense's sentencing memorandum, Williams argued the jury's verdicts demonstrated that it "rejected the prosecution theory that [ ] Williams harbored a dual intent in assaulting [Kenneth]" and instead found he had "a singular intent in the 5 to 15 minute beating of [Kenneth]: revenge[.]" (Emphasis omitted.) Before defense counsel could fully expand on this argument at the sentencing hearing, the trial court interjected and stated, "I agree with you, when you're beating a man with a bat, you're not thinking at the time of I'm going to move on from torturing him, at this point now I'm going to move on to creating mayhem."

Before pronouncing the sentence, the trial court again stated, "I do agree with [defense] counsel on the intent issue. I think that all of this happened very quickly. And while the jury has the ability to distinguish the intent aspects necessary to differentiate torture from mayhem, I don't necessarily have to do that at sentencing. So therefore, I choose the middle term of four years. That will run concurrent with . . . [c]ount 1." The court then stayed the concurrent term on count 2.

It is evident the trial court determined section 654 applied. As such, we agree with Williams the court made the "common error" of imposing a concurrent term rather than imposing and staying sentence pursuant to

---

2     Aggravated mayhem requires the specific intent to maim. (§ 205; *People v. Assad* (2010) 189 Cal.App.4th 187, 195.) Simple "mayhem requires no specific intent to maim or disfigure; thus, '[s]o long as a general criminal intent is present, the requisite malice may inferred from the fact of the injury.' " (*People v. Rodarte* (2014) 223 Cal.App.4th 1158, 1170; see § 203.)

section 654 on the mayhem count.  (*People v. Guzman* (1996) 45 Cal.App.4th 1023, 1028; see *Alford, supra*, 180 Cal.App.4th at p. 1469.)

The Attorney General, however, argues the trial court, by designating concurrent terms for counts 1 and 2, "implicitly conclud[ed] that the acts were separate or [Williams] harbored separate objectives in committing them." The Attorney General further argues there is "ample evidence" to support a determination that Williams attacked Kenneth "with a bat, stopped, and with an opportunity to reflect, chose to switch the weapon he was using to a hatchet, and attacked [Kenneth] anew," such that the court's implied finding of separate punishment was permissible under section 654.  (See *People v. Mendoza* (2022) 74 Cal.App.5th 843, 854 ["where multiple acts evincing the same intent are sufficiently independent to reflect a renewal of such intent, section 654 is no bar to separate punishment"].)

We are not persuaded.  Ordinarily, if the court makes no express findings on the issue, a finding that the crimes were divisible is implicit in the judgment and must be upheld if supported by substantial evidence. (*People v. Blake* (1998) 68 Cal.App.4th 509, 512.)  The rule does not apply here because the trial court expressly agreed with defense counsel's argument on "the intent issue" for purposes of section 654.  The court simply did not make the findings the Attorney General advances on appeal.  And because the People fail to grapple with the court's actual findings, it does not contend the court erred in any respect with its section 654 determination. Accordingly, we uphold the court's determination that section 654 applied (*Jones, supra*, 103 Cal.App.4th at p. 1143) but shall modify the judgment to strike the court's statement that the sentence on count 2 is concurrent.

14

## III.

### *The Trial Court Did Not Misapprehend its Discretion in Sentencing Williams to Life Imprisonment*

At the time of Williams's sentencing on December 30, 2022, recent amendments to sections 654 and 1170 had been in effect for nearly a year.

Assembly Bill No. 518 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 441), effective January 1, 2022, amended section 654, subdivision (a), to provide, in relevant part: "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (Italics added.) Previously, where section 654 applied, the sentencing court was required to impose the sentence that "provides for the longest potential term of imprisonment" and stay execution of the other term. (§ 654, former subd. (a).) However, as amended by Assembly Bill No. 518, section 654 "now provides the trial court with discretion to impose and execute the sentence of *either term*, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*People v. Mani* (2022) 74 Cal.App.5th 343, 379.)

Senate Bill No. 567 (2020–2021 Reg. Sess.) (Stats. 2021, ch. 731), also effective January 1, 2022, amended section 1170, subdivision (b), "to make the middle term the presumptive sentence for a term of imprisonment." (*People v. Lopez* (2022) 78 Cal.App.5th 459, 464 (*Lopez*).) Sentencing courts "now must impose the middle term for any offense that provides for a sentencing triad unless 'there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial

15

by the jury or by the judge in a court trial.  (§ 1170, subd. (b)(1) & (2).)' "
(*Lopez*, at p. 464.)  Under the former law, the trial court had broad discretion
to determine whether imposition of the lower, middle, or upper term with
respect to count 3 "best serve[d] the interests of justice."  (*Ibid*., citing former
§ 1170, subd. (b).)

The trial court in this case was keenly aware of its expanded discretion
under amended section 654—to impose either the longer term of life
imprisonment on the torture count or a determinate term of four years on the
mayhem count—and of its constrained authority under amended
section 1170, subdivision (b), to select the presumptive middle term unless
aggravating factors have been proven beyond a reasonable doubt or
stipulated to by the defendant.  Williams does not contend otherwise.  Thus
he does *not* claim the court failed to exercise "informed discretion" in its
sentencing decisions because it misapprehended the scope of its discretion
under the new sentencing laws.  (See *Lopez*, *supra*, 78 Cal.App.5th at p. 467
[defendants are entitled to sentencing decisions made in the exercise of the
"informed discretion" of the sentencing court].)

Rather, he contends the trial court failed to understand it had
discretion to accept his "stipulation to facts" in aggravation as a means to
select the upper term for mayhem and avoid sentencing him to life
imprisonment for torture.  He argues we should remand the matter to afford
the court the opportunity to exercise its discretion to accept his stipulation to
factors in aggravation.  We decline to do so.

Williams bases his contention on certain comments the trial court
made about its views on recent legislative changes to California's sentencing
laws.  The court asked defense counsel, who was requesting a determinate
term, "[H]asn't the legislature, in their desire to lower sentences for

16

everything, kind of handicapped me in this? [¶] Let's say that I wanted to go with the determinative term of mayhem which is two, four, and . . . eight. I can't get to eight because there's no aggravating factors; right? And then we look at [William's] under 26; right? So all of a sudden, am I only left with a two-year term for this crime? If I was to run the other one concurrently. Is that a fair sentence?" To this last question, defense counsel responded that Williams was to be sentenced later the same day to a "significant sentence" for an unrelated homicide conviction.[3]

Defense counsel then argued the prosecution could have amended the complaint before trial to "add five aggravating factors," including for example Williams's increasing criminality and use of a weapon. The trial court responded that it did not have any aggravating factors pled, and the colloquy continued:

> [Court]: But I don't have that here. I have the sentencing structure the legislature has given me. And in the old days, I could have—I *could* go to the eight years and say that's the appropriate term for this, not the life term, which is actually seven years, if you really want to talk about it. [¶] But the legislature has basically taken that out of my hands with the exception of a two-year sentence; right? Which is, let's face it, this crime is worth a lot more than two years.
>
> [Defense]: . . . So again, the prosecution had every ability to give Your Honor more choices. *There's a second path, which is my client stipulating or agreeing to something.*
>
> [Court]: But we're not here for that today. . . .
>
> [Defense]: But if the choice is a life sentence or stipulating to an aggravating factor that could have been filed by the prosecution, obviously my client will choose the latter—or the former.

---

[3]     In April 2022, a jury convicted Williams of voluntary manslaughter (§ 192, subd. (a)) and found true the allegation he personally used a deadly weapon (§ 12022, subd. (b)(1)) in case No. SCD282741. He was sentenced to seven years in state prison, the statutory maximum in the case.

[Court]: *Well, I'm not here to negotiate a sentence.* I'm just telling you, I want to put it on the record because I don't think the legislature has thought of a situation like this. And I like discretion. And by taking away my discretion for the upper term, they have really handicapped me, not just in this case but in other cases. And then by forcing me to look away from the mid— even the middle term because of—I mean, I know they have done this with good intent but they don't see sometimes the consequences of what they do. [¶] . . . It's just like with them doing away with prison priors. They didn't realize we use prison priors every day to get to certain terms. . . . [¶] But I am the one at the end of all this that has to make certain decisions. And I'm just, like I said, pointing out that this kind of the framework that we have now." (Italics added.)

The trial court made these additional comments and then proceeded to sentencing:

"[Court]: . . . let me make some observations. First of all, this case did involve great violence and it was a very vicious attack. The defendant used actually not one weapon but two weapons. His attack was on an individual who was very vulnerable. He was sleeping in his tent, which essentially is his home. And at the time, obviously, the defendant was a clear and serious danger to society, which in society at that point would have been the homeless encampment at Qualcomm Park. [¶] So, in this matter, as I've indicated before, I don't think the legislature has given me many choices. It's not a two-year case at all, even it's not a four-year case. And I don't have any ability to get to *any determinate term* and do justice to this case." (Italics added.)

Williams argues the foregoing comments by the trial court demonstrate that it misunderstood it had discretion to accept his offer to stipulate to unpled aggravating factors and implied an upper term of eight years was "the appropriate sentence." We disagree. The court did not say, "I have no discretion to accept a defendant's stipulation or agreement to unpled aggravating factors." It simply rejected Williams's offer, stating it was not negotiating a sentence. Moreover, as Williams concedes, nothing the court said suggested that it would have imposed the upper term of eight years. To

18

the contrary, it said it did not have the ability to get to "*any determinate term and do justice to this case.*"  (Italics added.)  Although the trial court's musings about recent legislative changes to the sentencing laws could have been left unsaid, we are satisfied the trial court acted well within its discretion in selecting the indeterminate term as the principal term under section 654.

## DISPOSITION

The judgment is modified to strike the trial court's statement in its oral imposition of sentence that the sentence on count 2 is concurrent.  The judgment is affirmed as modified.  The trial court is directed to amend the abstract of judgment to reflect the modified judgment and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

DO, J.

WE CONCUR:


IRION, Acting P. J.


CASTILLO, J.

19